LEDESMA ET AL., APELADOS, *v.* AGRAIT ET AL., APELANTES.

APELACIÓN procedente de la Corte de Distrito de San Juan, Sección 1ª.

No. 851.—Resuelto en mayo 26, 1913.

MANDATO—VENTA OTORGADA POR UNA PERSONA CON EL DOBLE CARÁCTER DE MANDATARIO DEL VENDEDOR Y DEL COMPRADOR—RATIFICACIÓN DE LOS ACTOS DEL MANDATARIO.—En el año 1892, Silvestre Iglesias como mandatario de Salvador Ledesma, causante de los demandantes, y como mandatario de su esposa, otorgó una escritura de venta de la participación que su mandante tenía en determinada casa.  Dicha casa fué adquirida en su totalidad por la esposa de Iglesias, pero una tercera parte le fué traspasada a Ledesma, porque él aportó la tercera parte del precio, según era convenido.  Con posterioridad a la venta Ledesma escribió a Iglesias aprobando dicha operación y alegrándose de que hubiera pasado a poder de su esposa.  Iglesias era mandatario de Ledesma para otros asuntos y entre ambos existían relaciones íntimas de amistad y de negocio.  Esta venta fué atacada de nula, porque según el artículo 1362 del Código Civil revisado equivalente al 1459 del

Código Civil Español vigente cuando se hizo la venta, un mandatario no podía adquirir bienes de su mandante. Se resolvió:

1. Que el hecho en sí de que en el otorgamento de la escritura de venta compareciera Iglesias como apoderado del vendedor y del comprador es una circunstancia de importancia subsidiaria, subordinada al hecho de si como mandatario del comprador adquiría para sí.

2. Que aun en el supuesto de que se hubiera probado que el dinero con que la esposa de Iglesia adquiría dicha participación no era de ella, sino dinero ganado por el marido durante el matrimonio, la alegación de cuyo hecho no aparece de la demanda, tal hecho demostraría que la finca fué adquirida a nombre de la esposa para la sociedad de gananciales, pero nó para el marido individualmente, y la ocultación de la procedencia del dinero por Iglesias a su poderdante no constituye una ocultación de un elemento esencial del contrato que pudiera viciar de nulidad la ratificación hecha del mismo por el mandante.

3. Que dicha venta fué ratificada por el mandante con conocimiento de todos los elementos esenciales del contrato y que en virtud de dicha ratificación tal venta fué convalidada, pues se trataba de un contrato ratificable.

4. Que para determinar si algunos de los contratos prohibidos en el artículo 1362 del Código Civil Revisado es o no confirmable, debe atenderse a la naturaleza especial de cada uno, pues no todos se rigen por el mismo principio, siendo la tendencia moderna en la interpretación de estos contratos favorable a la libertad de enajenación.

5. Que el Código Civil no establece distinción alguna entre contratos nulos y anulables y por tanto si un contrato reune todos los requisitos del artículo 1228 de acuerdo con el 1277, puede ser ratificado, a menos que adolezca de uno de los vicios definidos en el artículo 1242.

6. Que la sentencia del Tribunal Supremo de España de abril 11, 1894, no es aplicable a este caso, porque el fundamento primordial de la misma fué la prescripción y no se discutió si el contrato en cuestión era o no ratificable.

7. Que las ventas entre condueños son favorecidas por la ley y el hecho de que la esposa de Iglesias fuera condueña en la casa cuyo condominio le vendió Ledesma, es una circunstancia a tener en cuenta en favor de la posibilidad de la ratificación.

Los hechos están expresados en la opinión.

Abogado de los apelantes: *Sr. Juan de Guzmán Benítez.*

Abogados de los apelados: *Sres. Eugenio Benítez Castaño* y *Francisco Socorro.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

En este caso la Corte de Distrito de San Juan dictó sentencia a favor de los demandantes en pleito sobre reivindicación.

Los demandantes son los herederos testamentarios de Salvador Ledesma Nutó quien falleció en Málaga, España, el día 28 de febrero de 1904. El demandado Silvestre Iglesias y

Font, fué hasta el veinte y ocho de febrero de 1904, el adminis-
trador o agente en esta Isla de los bienes de Salvador Ledesma
Nutó, estando comprendida entre estos bienes una tercera
parte proindivisa en una casa y solar de la calle de la Luna
de esta ciudad.

En dos de enero de 1892, Ledesma y Nutó otorgó un poder
a favor de Iglesias y Font, por virtud del cual este último
quedó autorizado, entre otras cosas, para vender dicha parti-
cipación a la persona que tuviera por conveniente por el precio
que considerase más ventajoso.  De conformidad con el poder
el referido Silvestre Iglesias compareció ante un notario en
23 de enero de 1892, otorgando escritura de venta de dicha
participación proindivisa a favor de su esposa, compareciendo
el expresado Iglesias al otorgamiento de esta escritura no
sólo en su carácter de mandatario del vendedor, sino también
de su esposa, la compradora, de acuerdo con el poder que le
había sido otorgado por ella.  También se hizo constar en la
escritura que el dinero de la compra pertenecía a los bienes
propios de la compradora que había adquirido de su padre.

No es una cuestión muy esencial para la resolución de este
caso que Iglesias hubiera también prestado su consentimiento
como esposo para la aceptación de la escritura por su esposa.
El hecho de que solamente compareciera una persona en repre-
sentación de todas las partes en el contrato, es un asunto de
orden secundario, consistiendo la verdadera cuestión en deter-
minar si puede o nó un mandatario comprar para sí o para
su esposa según sea el caso, una finca o participación en la
misma de cuya venta se le había encargado, alegando los ape-
lados que la venta hecha en tales condiciones es enteramente
nula e ineficaz, sin ningún valor legal, y que dicha venta tal
como se efectuó en este caso no puede ser ratificada.  Los
apelantes sostienen que una venta que se lleva a cabo en tal
forma es anulable *prima facie,* y se fundan principalmente en
los actos de Ledesma Nutó, según los cuales alegan que la
venta hecha a los apelantes o a cualquiera de los mismos fué

confirmada o ratificada. Alegan, además, que la acción ha prescrito por ser una sobre nulidad de un contrato.

Los apelados han puesto en duda la cuestión de si realmente Iglesias hizo la venta que se discute a su esposa. Insisten en que el dinero satisfecho por la adquisición de la participación proindivisa del tercio no procedía de los bienes propios de la esposa según aparece de la escritura, sino que fué adquirido por el esposo después del matrimonio, y por tanto que el traspaso se hizo a él.

Prescindiendo de la cuestión de si se probó eficazmente en el juicio a quién pertenecía realmente el dinero de la compra, creemos, si ésta tiene alguna importancia, que los apelados tenían que limitarse a las alegaciones contenidas en su demanda. En cuanto a este particular, en dicha demanda no se hizo sino una descripción de la escritura de enero 23 de 1892, alegándose además que Silvestre Iglesias había comparecido en dicha escritura con el triple carácter de mandatario del vendedor, y administrador y esposo de la compradora. La demanda alega que la esposa fué la compradora. Los demandados no tuvieron conocimiento por la demanda que presentaron los demandantes acerca del hecho de que se proponían demostrar, que el dinero que en la escritura constaba como precio de la venta perteneciera al marido o a la sociedad de gananciales. Convenimos además con los apelantes en que la prueba producida en el juicio, que tiende meramente a mostrar que la finca fué adquirida durante el matrimonio, muestra solamente una venta a dicha sociedad y no que la misma se hiciera al esposo.

Es un principio general de ley que antes de que pueda alegarse que el principal ha ratificado un acto ejecutado por su mandatario para el cual no estaba autorizado, deberá dicho principal quedar informado de todos los hechos esenciales. Acerca de este particular no existe diferencia alguna entre la ley civil y la americana. Nace este principio de la necesidad en que están las partes contratantes de prestar su consentimiento. No puede alegarse que el mandante ha prestado

su consentimiento si ratifica o aprueba el acto ejecutado por su mandatario consigo mismo habiendo mediado falsedad en la información.

No puede decirse que el principal está impedido o imposibilitado para negar una venta realizada por su mandatario, para lo cual no estaba facultado por el hecho de haber escrito una carta a dicho mandatario aprobando la expresada venta, si resulta que el mandatario no informó en primer término a su principal de algún hecho que fuera esencial para su ejecución. Pero el hecho que se oculta debe ser esencial. Por consiguiente, la cuestión de que quizás el precio de la venta de referencia no perteneciera a los bienes privativos de la esposa no podía considerarse como un hecho esencial que había sido ocultado. Era indiferente para Ledesma Nutó cuál fuera la procedencia del precio de la venta o que la participación vendida perteneciera más bien a la sociedad conyugal que no a la esposa. Esto era un asunto de la incumbencia de los esposos o tal vez luego de alguno de los mismos y los herederos del otro. Ledesma Nutó no podía solicitar la nulidad del supuesto contrato por el fundamento de haberse hecho constar una falsedad en la escritura en cuanto al origen o procedencia del precio de la venta. Por tanto, si la supuesta venta pudo ser ratificada o confirmada, no había necesidad de ratificarla con respecto a este particular. Además, podemos decir de pasada, que no creemos que sea necesario determinar si se probó o no satisfactoriamente que el precio de la venta procedía o no de los bienes privativos de la esposa.

Y pasemos ahora a considerar, suponiendo que la venta pudo haber sido ratificada, si se hizo tal ratificación. Los autos y la opinión de la corte inferior ofrecen muy poca duda en cuanto a este punto. Los hechos fueron sustancialmente los siguientes: Iglesias no era solamente el mandatario de Ledesma con instrucciones de vender la participación indivisa del tercio que tenía dicho Ledesma en la casa de la calle de la Luna, sino que también era a la vez su representante en otros asuntos. Iglesias y su esposa estaban íntimamente

relacionados en amistad y negocios con Ledesma desde hacía mucho tiempo.  La referida casa de la calle de la Luna fué primeramente comprada en el año 1880 a·nombre de la esposa de Iglesias, aportando a dicha venta Ledesma un tercio del precio de la referida venta, cuyo tercio de participación se le traspasó a Ledesma por los esposos.  De modo, que en la fecha de la venta que se dice era nula según los autos y el entendimiento que al parecer existía entre las partes, Ledesma tenía una participación de un tercio y la Sra. Irene Agrait y Font de Iglesias dos tercios de participación en la misma propiedad.  Los demandados presentaron pruebas que no fueron contradichas tendentes a demostrar que Ledesma había convenido en dar una oportunidad a la Sra. Iglesias de poder comprar el tercio de participación al mismo precio que se lo hubiera vendido a otra persona, estando esta prueba justificada por la carta que Ledesma escribió después de la venta, la que transcribiremos más adelante.  Además de las manifestaciones hechas por Iglesias, existen algunas indicaciones en la correspondencia, de las que resulta que con anterioridad a la fecha de la venta había ciertas negociaciones pendientes para vender toda la casa al Sr. Pinzuela por $9,000, pero que se desistió de dichas negociaciones por no haber querido Iglesias rebajar el precio.  Entonces fué que se otorgó la escritura de enero 23 de 1892.  Subsiguientemente, en 8 de marzo de 1892, Ledesma escribió a Iglesias la siguiente carta:

"Su apreciada del 15 del ppdo. tengo a la vista por la cual quedo impuesto en todos s/ contenidos.

"Me impongo del obstáculo que expuso el comprador en la realización de la venta de la casa Luna 52; por lo cual V. no quiso acceder en hacerle alguna bonificación en el precio, y con respecto a mi tercera parte le hizo venta a su señora por la cantidad de $3,000, igual que le había ofrecido dicho señor.  Me alegraré que la disfruten por muchos años, pues siempre vale más una renta segura aunque limitada que la eventualidad y riesgo del capital movible.

"He visto la cuenta corriente que me acompaña con un saldo a mi favor de $2,587, hasta el 10 del ppdo. que soy de conformidad en un todo; para cubrir la expresada suma he retirado de s/ seno

un giro a m/ orden del Banco de Emisión y Descuento, por
£228 a/c de Fred. Hortz de Londres a 8 d/v y otro también a m/o
s/ París por francos 5,613.50 a/c de André Nenflise & Ca. que a
los respectivos cambios de $5.95 £ y 18½ por ciento francos forman
la expresada suma de $2,687, igual al saldo de la cuenta que con
la fecha indicada me remite, quedando saldo y de conformidad.

"Me he alegrado que haya entrado en su cálculo la compra de la
tercera parte de la casa, pues aunque me cuesta una pérdida de consi-
deración queda V. con más independencia y yo cumplo con V. la
palabra empeñada; por lo demás creo no obstante que V. coloca bien
el dinero libre de contingencias."

Los autos muestran claramente que la suma de $2,587 a
que se refiere la carta era un saldo de cuentas entre Iglesias
y Ledesma del cual los $3,000, o sea el precio de la venta de
la participación del tercio se había cargado a Iglesias. Estos
$3,000 formaban precisamente la tercera parte del precio
que esperaban los propietarios recibir del Sr. Pinzuela por
la venta de toda la casa. El signo de $ que aparece en los
autos se refiere a pesos españoles. En vista de estos hechos
no dudamos que Ledesma tuvo todo el conocimiento esencial
que tenía su mandatario y que el primero ratificó la venta
si era necesario que lo hiciera dada la naturaleza prohibida
de la transacción. Creemos que tal ha sido también el criterio
de la corte inferior. La prohibición a que nos referimos está
contenida en el artículo 1362 del Código Civil y es idéntica en
sustancia al artículo 1459 del Código Civil Español. Dicho
artículo es como sigue:

"Artículo 1362. No podrán adquirir por compra, aunque sea
en subasta pública o judicial, por sí ni por persona alguna intermedia:

"1. El tutor, los bienes de la persona o personas que estén bajo
su tutela.

"2. Los mandatarios, los bienes de cuya administración o enaje-
nación estuviesen encargados.

"3. Los albaceas, los bienes confiados a su cargo.

"4. Los empleados públicos, los bienes del Pueblo de Puerto Rico,
de los municipios, de los pueblos y de los establecimientos también
públicos, de cuya administración estuviesen encargados.

"Esta disposición regirá para los jueces y peritos que de cualquier modo intervinieren en la venta.

"5. Los jueces, individuos del Ministerio Fiscal, secretarios de tribunales y juzgados y oficiales de justicia, los bienes y derechos que estuviesen en litigio ante el tribunal, en cuya jurisdicción o territorio ejercieran sus respectivas funciones, extendiéndose esta prohibición al acto de adquirir por cesión.

"Se exceptuará de esta regla el caso en que se trate de acciones hereditarias entre coherederos, o de cesión en pago de créditos, o de garantía de los bienes que posean.

"La prohibición contenida en este número 5 comprenderá a los abogados respecto a los bienes y derechos que fueren objeto de un litigio en que intervengan por su profesión y oficio."

Es un hecho que ha sido admitido que si los actos aquí prohibidos son meramente anulables, pueden ser ratificados o confirmados, pero no de otro modo. Artículos 4 y 1276 al 1280 del Código Civil. Del artículo 4 se deduce que la Legislatura empleó la parabra "nulo" en el sentido de significar "nulo" o "anulable." Ese artículo es como sigue:

"Artículo 4. Son nulos los actos ejecutados contra lo dispuesto en la ley, salvo los casos en que la misma ley ordene su validez.

"Los derechos concedidos por las leyes son renunciables, a no ser esta renuncia contra la ley, el interés o el orden público, o en perjuicio de tercero."

Si se examina el predicho artículo 1362 del Código Civil se verá que no son de igual naturaleza todos los actos que en el mismo se prohiben pues algunas de las personas a que se refiere son funcionarios públicos, otros cuasi-públicos, así como los tutores, albaceas y administradores, y otras personas privadas. Aunque todos los actos están prohibidos claramente, sin embargo, la cuestión referente a si determinado acto debe o nó ratificarse, depende de la naturaleza esencial del mismo. El interés público puede no ser el mismo con respecto a funcionarios públicos que a personas privadas.

El Estado puede estimar oportuno expresar que un funcionario público no tiene capacidad o facultad para hacer un traspaso a favor de sí mismo y por el mero hecho de estar

comprendidos los funcionarios públicos en esta prohibición, la infracción de la misma puede ser de orden público. Hacemos esta distinción en primer lugar, porque si la venta en cuestión pudo ser ratificada no queremos que se entienda que sostenemos el critero de que puede ser ratificada toda venta que se efectúa, no obstante las disposiciones del artículo 1362. Puede ser que algunas de ellas no lo sean, pero si existe duda acerca de si todos los actos prohibidos deben ser considerados como que no pueden ser ratificados, diremos que la tendecia moderna consiste en interpretar el estatuto en el sentido de que el mismo tiende a favorecer la libertad de las enajenaciones.

Los civilistas Manresa, Martínez Ruiz y los apelados sostienen que todos los contratos celebrados en contravención de lo dispuesto en el artículo 1362 son inexistentes. ¿Existe algo en las palabras mismas contenidas en el artículo 1362 de donde pueda deducirse que los actos ejecutados con infracción de dicho artículo son inexistentes? "Las siguientes personas no pueden adquirir," dice dicho artículo, pero lenguaje igualmente imperativo se emplea en los artículos 178, 1226, 1328, 1451, 1460 y 1617 y sin embargo, todos los actos que en ellos se prohiben pueden ser ratificados. El artículo 178 expresa que son nulos los matrimonios en los cuales no se hayan observado todos los requisitos exigidos por el Código, pero el 179 declara, que solamente pueden pedir la nulidad del matrimonio ciertas personas. En muchos casos los hijos nacidos con anterioridad a la declaración de nulidad pueden ser legítimos y adquirir derechos de propiedad. Según el artículo 1328 el marido no podrá enajenar los bienes inmuebles de la sociedad de gananciales sin el consentimiento expreso de la mujer, pero la venta que efectúe de tal manera puede ser ratificada. No es necesario continuar citando todos los artículos o la jurisprudencia que se relaciona con los mismos. Creemos que se ha demostrado de modo suficiente, tanto ahora como en otras partes de la opinión, que no puede deter-

minarse si un acto es susceptible de ser ratificado por la mera forma de las palabras empleadas por la ley.

Examinemos las disposiciones del Código Civil que se refieren a este caso. Haremos mención del actual Código Civil pues no existe incompatibilidad alguna esencial en cuanto a los artículos de referencia entre el Código Civil Español y nuestro propio código. El artículo 4º. según hemos visto, dispone que los actos ejecutados contra lo dispuesto en la ley, salvo en los casos en que la misma ley ordene su validez, son nulos, y que los derechos concedidos por las leyes son renunciables, a no ser esta renuncia contra la ley, el interés o el orden público o en perjuicio de tercero. El artículo 1228 prescribe que no hay contrato sino cuando concurren los requisitos siguientes: 1. Consentimiento de los contratantes; 2. Objeto cierto que sea materia del contrato; 3. Causa de la obligación que se establece. El artículo 1267 dispone que los contratos en que concurran los requisitos que expresa el artículo 1228 pueden ser anulados aunque no haya lesión para los contratantes, siempre que adolezcan de alguno de los vicios que los invalidan con arreglo a la ley. El artículo 1277 prescribe que sólo son confirmables los contratos que reunan los requisitos expresados en el artículo 1228. El artículo 1242 expresa que los contratos sin causa, o con causa ilícita, no producen efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral.

Examinados estos artículos resulta evidente que la ley no establece división alguna entre aquellos contratos que son nulos y los que meramente son anulables. El artículo 1280 determina que la confirmación purifica al contrato de los vicios de que adoleciera desde el momento de su celebración. Por consiguiente, si un contrato reune todos los requisitos exigidos por el artículo 1228, puede de acuerdo con el 1277 ser confirmado a menos que adolezca de uno de los vicios especificados en el artículo 1242. Un contrato que tenga por causa un delito o un acto que la humanidad necesariamente lo considere inmoral puede constituir un ejemplo claro de los

actos que de tal modo se prohiben. El contrato sometido a nuestra consideración reunía todos los requisitos del artículo 1228, pero fué otorgado con infracción del artículo 1362. Pero no todo acto especificado en el artículo 1362 es necesariamente inmoral. La determinación de ese hecho depende principalmente de la naturaleza íntima y esencial de la determinada transacción a que el mismo se refiera y en el presente caso según indican los autos en su totalidad, Iglesias procedía con entero conocimiento de Ledesma y entre ellos no existía inmoralidad o falta de honradez en sus negociaciones. Ledesma prontamente ratificó el acto de su mandatario.

Creemos que estos principios resultan claros de un mero examen que hagamos del Código Civil. Sin embargo, hay casos de la Corte Suprema de los Estados Unidos, que dan alguna luz sobre la cuestión. El caso de *Michoud* v. *Girod et al.,* 4 How., 554, surgió en Louisiana, en cuyo Estado los precedentes legales han sido tomados del Código de Napoleón. En dicho caso el tribunal se expresó en los términos siguientes:

"La regla general sostiene la gran obligación moral que tenemos de abstenernos de tomar parte en relaciones que por lo general crean un conflicto entre el interés propio y la honradez. Dicha regla establece una restricción para todos los mandatarios o agentes, ya sean públicos o particulares. Y donde mejor puede comprenderse el valor de la prohibición así como donde su aplicación es más frecuente es en las relaciones particulares o privadas que pueden establecerse entre el vendedor y el comprador. La incapacidad para comprar es una consecuencia de esa relación entre los mismos, que obliga a uno de ellos a proteger los intereses del otro y de cuyo cumplimiento fiel de ese deber, su propio interés puede desviarlo. En este antagonismo de intereses es que la ley interviene sabiamente. Esta intervención tiene lugar no porque pueda ocurrir en algunos casos que de la interpretación de esa obligación puedan resultar perjudicados los propios intereses de la persona encargada de cumplirla sino por la probabilidad en mu-

chos casos y el peligro que hay en todos, de que los dictados del interés propio puedan ejercer una influencia predominante anulando al que está envuelto en la obligación.  La ley por consiguiente prohibe a una parte que compre o adquiera a su nombre aquello que según su deber o la confianza que en él se deposita le obliga a vender por cuenta de otro, y le prohibe que compre a nombre de otro aquello que vende por su propia cuenta.  Por consiguiente no se le permite que ejerza las dos funciones de comprador y vendedor que son opuestas, porque su interés cuando es el vendedor o comprador por su propia cuenta, está directamente en conflicto o en pugna con aquel de la persona a cuyo nombre compra o vende.

"Y no establece diferencia alguna en la aplicación de esta regla, el hecho de que la venta haya tenido lugar en pública subasta, *bona fide,* y se haya vendido mediante el pago de un precio razonable, no habiendo el albacea comprado para sí, sino que por convenio previo con dicho albacea, resultó ser el comprador una tercera persona a quien se le confió la propiedad para el exclusivo uso y beneficio de la esposa del albacea, que era uno de los fideicomisarios, (*cestuis que trust*), y que por tanto tenía intereses en la propiedad según el testamento otorgado por el testador.  En tal caso no hay que investigar si existió o nó fraude en realidad.  La compra es nula y se anulará a solicitud del fideicomisario, y se ordenará su reventa por el fundamento de existir una tentación de cometer un abuso así como por el peligro de que pueda ocurrir algún engaño o fraude que esté fuera del alcance de la corte."  En el caso de *Hoyt* v. *Latham,* 143 U. S., 553, la corte no obstante, permitió que un contrato que adolecía de un defecto parecido al del contrato a que este pleito se refiere fuera confirmado, aprobando y explicando el caso de *Michoud* v. *Girod* citado anteriormente.  Las autoridades americanas sostienen el principio de la posibilidad de que un contrato como el otorgado por Iglesias y Ledesma puede ser confirmado.  *Hammond* v. *Hopkins,* 143 U. S., 224; *Scottish-American Mortgage Company* v. *Clowney,* 49 S. E., 569; *U. S.*

*Ewell* v. *Daggs,* 108 U. S., 143; *Obert* v. *Obert,* 12 N. J. Eq., 423; *Porter* v. *Woodruff,* 36 N. J. Eq., 174; *Masch* v. *Whitmore,* 21 Wall., 178; *Bell* v. *McConnell,* 41 Am. Rep., 528; *Pridgen* v. *Adkins,* 25 Tex., 388.

El principio de ley existe independientemente de la morali-dad en la determinada transacción y la prohibición contenida en el artículo 1362 no está comprendida por razón de su na-turaleza esencial en una clase distinta de las demás reglas de ley a que hemos hecho referencia.

Los apelados confían grandemente en la opinión de Man-resa y Martínez Ruiz. Pero aparece que cada uno de estos comentaristas se funda en una opinión del Tribunal Supremo de España que no sostiene su criterio. En ese caso se pre-sentó la demanda ante el Juzgado de Falset en 19 de mayo de 1890, con la solicitud de que se declarase nula y de ningún valor ni efecto la escritura de 30 de agosto de 1852 otorgada por Don Juan Sabaté y Bargalló, y por la que éste, para el caso de morir sin dejar hijos legítimos y naturales, retro-donaba a favor de su padre, Don Juan Sabaté y March, y de sus sucesores, ciertos bienes que de él había recibido. Dic-tada sentencia en apelación por la Audiencia de Barcelona ab-solviendo de la demanda al demandado, se interpuso recurso de casación que se fundó en que la fecha de prescripción de la acción de nulidad no debía contarse desde el 30 de agosto de 1852 en que la escritura se otorgó, sino desde la fecha de la muerte de Sabaté Bargalló ocurrida en 15 de diciembre de 1882, toda vez que había sido otorgada la retrodonación para el caso de fallecer sin dejar hijos legítimos y naturales, y porque de acuerdo con el *usatge Omnes causae* del *Recogno-verunt próceres,* el tiempo fijado para la prescripción de todas las acciones y causas de cualquiera naturaleza es el de 30 años, que no había transcurrido a contar desde el falleci-miento de Sabaté Bargalló. Pero el Tribunal Supremo de España por su sentencia de 11 de abril de 1894, partiendo de la base de que la escritura era nula por haberlo así re-suelto la sala sentenciadora, sin que las partes hubieran acu-

dido contra dicha calificación, declaró sin lugar el recurso fundándose en "que todo contrato otorgado contra precepto expreso de una ley prohibitiva engendra la acción necesaria para restablecer la virtualidad de la prohibición, infringida acción que teniendo este origen y alcances, no puede menos de ser eficaz desde el momento mismo de la celebración del referido contrato, en cuyo concepto es claro que pudo ejercitarse dicha acción de nulidad contra el donatario Don Juan Sabaté y March, a partir del día en que se otorgó la escritura antes mencionada, y lo es también que por no haberlo hecho hasta 1890 en que produjeron la demanda los causahabientes por título universal del retrodonante, han transcurrido con exceso los 30 años que para prescribir toda clase de acciones tiene señalado el *usatge Omnes causae,* título 2°., libro 7°. volúmenes 1°. de las Constituciones de Cataluña, capítulo 44 del *Recognoverunt próceres;*" por lo que la "sentencia recurrida se ajusta a la mencionada constitución y no ha podido infringir las doctrinas que juntamente con aquélla se invocan por el recurrente."

Se verá por tanto que el verdadero fundamento de la sentencia del Tribunal Supremo de España fué que la acción había prescrito. Además la cuestión de si era o nó anulable (*vel non*) no fué planteada.

Manresa en el tomo 10, página 102, llega a afirmar que el acto prohibido por el artículo 1362 es de tal modo nulo, que aun cuando el principal lo apruebe, sus herederos pueden aún anularlo o hacer caso omiso del mismo. Creemos que el gran jurisconsulto no tuvo en cuenta algunos de los otros principios de la ley Civil Española, según los cuales *nadie puede ir en contra de sus propios actos ni enriquecerse en perjuicio de otro,* o el principio de *estoppel.*

El artículo 1794 dispone lo siguiente:

"Aunque no hubiese ratificado expresamente la gestión ajena, el dueño de bienes o negocios que aproveche las ventajas de la misma será responsable de las obligaciones contraídas en su interés, e indem-

nizará al gestor los gastos necesarios y útiles que hubiese hecho y los perjuicios que hubiese sufrido en el desempeño de su cargo.

"La misma obligación le incumbirá cuando la gestión hubiera tenido por objeto evitar algún perjuicio inminente y manifiesto, aunque de ella no resultare provecho alguno."

La analogía es clara. Si el principal o mandante puede beneficiarse de los actos de cualquiera que le ofrezca sus servicios, puede ciertamente aprovecharse de los actos de un mandatario y ratificar actos sin autoridad pero que sean ventajosos para el principal.

Alguna importancia se ha dado al hecho de haber comparecido solamente una persona ante el notario. En lo sucesivo tales casos pueden ocurrir con más frecuencia, como cuando una corporación vende a otra y las mismas personas son los funcionarios que están al frente de cada una de las corporaciones.

No es necesario que se discuta la cuestión relativa a la prescripción con gran extensión. Si el acto de Iglesias pudo ser confirmado, como así lo creemos, ninguna causa de acción surgió para Ledesma o sus herederos.

Otro aspecto general de la cuestión se presenta con arreglo a los artículos 411 y 413 del Código Civil. El último de estos artículos dispone que las reglas concernientes a la división de la herencia serán aplicables a la división entre los partícipes, y el artículo 1362 exceptúa expresamente de sus disposiciones las acciones entre coherederos. De todos modos, el hecho de haber sido comprada la propiedad originalmente por la Señora de Iglesias y de poseerla en comunidad con Ledesma, es otro motivo que está en favor de que fué posible la ratificación. La ley favorece las ventas realizadas entre condueños.

Debe revocarse la sentencia.

*Revocada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro y Aldrey.

Juez disidente: Sr. MacLeary.