Francisco Cintrón López, demandante y apelado, v. Providencia Román, demandada y apelante.

No. 3979.—*Visto:* Diciembre 21, 1926. *Resuelto:* Marzo 25, 1927.

Matrimonios—Acción de Nulidad—Fundamentos de Nulidad—Incapacidad de las Partes Contrayentes—Matrimonio Contraído Dentro de los 301 Días Estatutorios.—Cuando una mujer contrae matrimonio dentro de los 301 días siguientes a aquél en que disuelve su matrimonio, y como fruto de la unión nace un hijo cuya gestación empieza en el claustro materno al transcurrir dos años de casada, no cabe sostener la nulidad de dicho matrimonio.

Sentencia de *Domingo Sepúlveda*, J. (San Juan), declarando con lugar la demanda en cuanto a la primera de sus causas de acción y sin lugar la contra-demanda, sin costas. *Revocada* y devuelto el caso para ulteriores procedimientos.

*B. F. Pacheco,* abogado de la apelante; *Enrique Campillo,* abogado del apelado.

El Juez Asociado Señor Franco Soto, emitió la opinión del tribunal.

Este pleito se inició solicitando el demandante el divorcio fundando su causa de acción en trato cruel e injurias graves. Más luego el demandante enmendó su demanda e incluyó otra causa de acción basándose en el artículo 131 del Código Civil Revisado, inciso 6º, pidiendo, por tanto, la declaración de nulidad del matrimonio que contrajo con la demandada. En esta causa de acción el demandante alega que la demandada era divorciada de su primer marido Ar-

mando Gautier por sentencia que quedó firme en septiembre 14, 1919, y que en noviembre 26, 1919, fué celebrado su segundo matrimonio con el demandante, o sea, antes de los trescientos un días a contar desde la fecha de aquella sentencia.   Alegó también el demandante que al transcurrir dos años de casados, "la demandada quedó en estado de preñez, naciendo la única hija que han tenido y procreado llamada Iris Hipólita."

La demandada contestó admitiendo estas últimas alegaciones y contrademandó, solicitando a su vez el divorcio, por abandono, trato cruel y adulterio del marido.   En la contrademanda, entre otras cosas, la demandada alega: "Que la causa de haber abandonado el demandante a la demandada es la de haberse enamorado de una señora llamada María Luisa Meléndez, viuda de Santana, con la cual vive maritalmente en Santurce, calle de Loíza No. 207, teléfono 16 negro, haciéndose aparecer como dependiente o socio de una tienda que ésta tiene."

La corte inferior en la opinión emitida, a pesar de declarar probada la contrademanda en el extremo que hemos señalado, decretó la nulidad del matrimonio fundándose en el inciso 6° del artículo 131 del Código Civil Revisado y en el caso de *Cabassa* v. *Nadal,* 23 D.P.R. 744.   El juez inferior parece que hacía con cierta repugnancia tal declaración porque mediaba la circunstancia de existir una hija que habían procreado demandante y demandada durante su unión conyugal y más allá del período de trescientos un días de celebrado el matrimonio.   La corte inferior dijo:

"Se hace constar que en el acto de la vista, el demandante desistió de su segunda causa de acción, o sea, de la acción de divorcio fundada en la causa de trato cruel e injurias graves; de modo que quedó únicamente en la demanda a considerar, la primera causa de acción, o sea la ejercitada sobre nulidad de matrimonio.

＊     ＊     ＊     ＊     ＊     ＊     ＊

"La Corte declara que se han probado, fuera de toda duda razonable, todos los hechos alegados en la primera causa de acción de la

demanda. También declara que se han probado satisfactoriamente todos los hechos alegados en la contrademanda de divorcio fundada en las causas de abandono y **adulterio.**

"La Corte ha estudiado detenidamente este caso porque no ha podido perder de vista que del matrimonio del demandante y la demandada existe una niña llamada Iris Hipólita, de dos años y medio de edad, la cual vive en compañía de la demandada, y la cual niña pagará todas las consecuencias de la violación de la Ley llevada cabo por sus padres; pero la Corte no tiene facultades para enmendar las leyes para proteger a personas inocentes que no han tenido ninguna culpa de su violación. Y de acuerdo con la Ley y los hechos probados, resulta que el matrimonio entre demandante y demandada fué contraído durante los 301 días siguientes a la fecha de la disolución del matrimonio anterior de la demandada (No. 6o., artículo 131 del Código Civil).

"Por todo lo anteriormente expuesto y vistos los artículos 4, 129, 131, 178 y 179 del Código Civil, y el caso de Cabassa vs. Nadal, 23 D.P.R. 744, la Corte se ve obligada, en cumplimiento estricto de la Ley, a declarar sin lugar la contrademanda y por el contrario, a declarar como declara con lugar en todas sus partes, la primera causa de acción de la demanda y en consecuencia . . . ."

El artículo 131 del Código Civil Revisado, en lo pertinente, dice:

"Art. 131.—Son incapaces para contraer matrimonio:

\*          \*          \*          \*          \*          \*          \*

"6. La viuda durante los trescientos un días siguientes a la muerte de su marido, o antes de su alumbramiento si hubiere quedado en cinta, y la mujer cuyo matrimonio hubiere sido declarado nulo o disuelto en los mismos casos y términos, a contar desde la fecha de la nulidad o disolución."

El artículo 45 del Código Civil español en ese particular dice:

"Art. 45. Está prohibido el matrimonio:

\*          \*          \*          \*          \*          \*          \*

"2. A la viuda durante los trescientos un días siguientes a la muerte de su marido, o antes de su alumbramiento si hubiese quedado en cinta, y a la mujer cuyo matrimonio hubiera sido declarado nulo, en los mismos casos y términos, a contar desde su separación legal."

Se notará que el artículo 131 *supra* ha seguido literalmente al Código antiguo español con la sola diferencia de que en el nuevo código, después de referirse a la mujer cuyo matrimonio hubiere sido declarado nulo, se añaden las palabras "o disuelto" para así conformarlo a la modificación fundamental de que fué objeto en materia de divorcio como resultado del cambio de soberanía. La reforma autorizando el divorcio *ad vinculum* ya había sido realizada por una orden judicial, aprobada por el gobierno militar en marzo 11, 1899, y la que más luego se incorporó, en lo sustancial, al Código Civil Revisado, aprobado en 1902.

En cuanto a los hechos en que descansa la acción de nulidad, no hay controversia entre las partes. La demandada se divorció de su primer marido por decreto judicial que quedó firme en septiembre 14, 1919, y a contar de esta fecha, cuarenta y dos días después, contrajo matrimonio con el demandante. Tampoco hay discusión respecto al nacimiento como fruto de la unión del demandante y la demandada, de una hija, a quien se le puso el nombre de Iris Hipólita, y cuya gestación empezó en el claustro materno al transcurrir dos años de casado, según así alega el mismo demandante en su demanda. Queda fuera de toda duda toda confusión en relación con la paternidad de la niña, porque ella nació más allá de los 301 días a que se refiere la prohibición del artículo 131 *supra*. Aun toda discusión de una preñez y parto tardío que se ha discutido en las escuelas, en casos excepcionales, no cabría ni siquiera considerarlos en este caso. Si esto es así, ¿qué efecto legal puede tener el artículo 131 bajo tales circunstancias? Esta disposición legal tiene sus precedentes desde la legislación romana, y el motivo que representa parece haberse seguido en toda nación civilizada. En roma era prohibido a la viuda casarse dentro del año de luto. En este punto dice Manresa: "Es de advertir que el año de luto de que hablan las leyes era de diez meses, según Cicerón y Séneca,

citados por Escriche en su Diccionario, y esto denota y viene en apoyo de lo que venimos diciendo: que ha influído más para la expresión del precepto el evitar *turbationen sanguinis . . . generationis aut seminis incertitudinem,* que el que la mujer guarde la consideración y reverencia debidas a la memoria de su difunto cónyuge." Tomo 1 pág. 253.

Las antiguas leyes españolas contenían igual prohibición para las viudas, señalándose, sin embargo, una excepción en la Novísima Recopilación que autorizaba a las viudas a casarse libremente dentro del año subsiguiente a la muerte del marido. La excepción pareció justificarse para aumentar la población, tal vez diezmada por la guerra, pero ella dió ocasión a las grandes discusiones que se suscitaron entre jurisconsultos y médicos para determinar la paternidad en los casos dudosos que se presentaban. Las reglas que se trataron de establecer fueron siempre arbitrarias y sujetas a presunciones. El parecido de los padres, tanto en lo físico como en lo moral, era un dato que se ofrecía como base para resolver las dificultades y así se acudía a otros detalles tendentes al mismo fin. Hubo quien sostuviera que el hijo pertenecería a los dos maridos o que no pertenecería a ninguno, y de este modo se cortaba el nudo gordiano. Para poner término a este estado de cosas, el Código Penal de 1850 (art. 400) castigaba a la viuda que se casara antes de los 301 días desde la muerte de su marido, etc. Igual disposición pasó al Código Penal Español de 1870. Y el artículo 495 del Código Penal que en mayo 23, 1879, se decretó para Puerto Rico, dice lo siguiente:

"La viuda que se casare antes de los trescientos un días desde la muerte de su marido o antes de su alumbramiento, si hubiere quedado en cinta, incurrirá en las penas de arresto mayor y multa de 125 a 1,250 pesetas.

"En la misma pena incurrirá la mujer cuyo matrimonio se hubiere declarado nulo, si se casare antes de su alumbramiento o de haberse cumplido trescientos un días después de su separación legal."

Groizard, ilustre comentarista del Código Penal Español, refiriéndose al artículo 490, equivalente al 495 *supra,* dice:

"También contiene este artículo la sanción de un precepto civil.

"Nuestra legislación no ha sido constante, respecto al tiempo de permitir el matrimonio de las viudas. En el Fuero Juzgo, en el Fuero Viejo y en las Partidas, se las prohibía casarse antes del transcurso de un año, contado desde el día de la muerte del primer marido. No está en lo cierto el ilustre jurisconsulto Pacheco, al consignar que las razones de esta prohibición fué el respeto a la memoria del marido difunto. El Código visigodo terminantemente consignó que la razón de su precepto era que la mujer 'non mate el parto ante que sea nazido.' El Código de Alfonso el Sabio expresó que 'defendían las leyes a las mugeres que non casen ante de este tiempo por dos razones: la una porque non dubden los omes, si aviniere que ascaesce ella en ese mismo año, de qual de los maridos, del muerto o del vivo, es el fijo o la fija que nasciere della. La otra es porque el marido segundo non haya mala sospecha contra ella, porque tan ayna quiso casar.'

"La Novísima Recopilación consideró de poca valía estos dos motivos para imponer esa prohibición a las viudas contrariando sus sentimientos y estímulos naturales. Hizo bien respecto del segundo; pero no en cuanto al primero, pues la importancia moral y legal de evitar la confusión de la prole, es razón suficiente para tener en suspenso por algún tiempo el derecho que a la mujer no por eso se negaba en absoluto de contraer las segundas nupcias." Tomo 5, pág. 510.

La ley sobre el matrimonio civil primero, y el Código Civil de 1885 por último, derogaron la ley recopilada y restablecieron el espíritu del antiguo derecho, y así sobre esos precedentes y principios se prescribió el artículo 45 *supra* del antiguo Código Civil, y así pasó en su letra y en su espíritu al Código Civil Revisado.

No podía encontrarse nada que fuese tan evidente en sentido que por el origen histórico del precepto en él no ha tenido más objeto que el fijar únicamente un término dentro del cual le sea prohibido a una mujer viuda o cuyo matrimonio se ha declarado nulo, contraer un segundo matrimonio para evitar la confusión de prole. En buena lógica

y como más sano a la razón y al mismo *status* del matrimonio, bajo las circunstancias de este caso, en que tódo peligro de confusión de prole ha pasado por haber transcurrido más del doble del tiempo señalado por el artículo 131, desde que empezó el estado grávido de la demandada, no es posible sostener la nulidad del matrimonio celebrado entre demandante y demandada. Si era imposible que las consecuencias que trata de evitar el legislador no podían darse en este caso mientras se procreaba y nacía la niña Iris Hipólita, el matrimonio de los contrayentes debe subsistir. Si no existía ya la causa, ¿cómo podían darse los efectos? El matrimonio participa de un doble carácter: de un contrato y de un status. Bajo este último aspecto el estado tiene un alto interés y el poder de controlar la relación personal que de él se deriva. En este sentido es que él interviene estableciendo las reglas por las que han de regirse los contrayentes. Los artículos 130, 131, 132, 133, 134 y 135 de nuestro Código Civil prescriben diferentes reglas en tal sentido. En ellos se establecen los diversos casos de incapacidad para contraer matrimonio. Pero no todos los casos producen el mismo efecto si en contra de la prevención de la ley las partes contrayeren matrimonio. Mientras en unos el matrimonio así contraído es nulo *ab initio,* en otros es solamente anulable. Esta teoría había sido sostenida en el caso de *Just* v. *Just et al.,* 32 D.P.R. 248 al considerar los artículos 130 *et seq.* del Código Civil en pleito que fué establecido sobre nulidad del matrimonio en virtud de que el esposo no sólo era impotente sino de insuficiente capacidad mental, y en el que, entre otras cosas, se dijo por esta Corte Suprema lo siguiente:

". . . Resultaría, por tanto, que la impotencia no es una falta de capacidad legal, sino únicamente una incapacidad especial, como la menor edad, u otras incapacidades tratadas en el artículo 131 y siguientes. La capacidad legal debe, por tanto, significar la capacidad cuya ausencia haría nulo el matrimonio *ab initio*. . .

"Nos inclinamos a resolver, sin otra consideración, que un contrato de matrimonio que es meramente anulable puede continuar o ser ratificado por los actos de las partes con tal que sean *sui juris,* como se indica en nuestra opinión original. . .

"Volviendo a examinar los artículos 130 y siguientes se verá que la incapacidad a que los mismos se refieren a veces hará nulo un matrimonio *ab initio* y otras meramente anulable. Por preceptos específicos de los mismos las partes en ciertos casos pueden ratificar el matrimonio o renunciar sus derechos. Un menor que contrae matrimonio sin el consentimiento de sus padres puede convalidar el matrimonio al llegar a su mayor edad. El pupilo que contrae matrimonio con su tutor antes de que se aprueben definitivamente las cuentas de la tutela, etc., puede asimismo ratificar el matrimonio al llegar a su mayor edad. En el caso de Ledesma v. Agrait, 19 D.P.R. 566, resolvimos asimismo que las disposiciones del artículo 1362 permitían la ratificación de contratos en los que se observaban las formalidades externas del artículo 1228. . ."

Se verá, pues, que tratándose de un matrimonio nulo *ab initio,* el matrimonio es inexistente, nunca ha existido y no produce efectos civiles. Un ejemplo claro de estos supuestos matrimonios es el contraído por los ascendientes y descendientes por consanguinidad. En los anulables el matrimonio es válido mientras no se declara judicialmente su nulidad. En 38 C. J. 1280–81, en relación con el efecto de uno y otro matrimonio, se dice lo siguiente:

"Cuando falta un requisito esencial exigido por la ley para que el matrimonio sea válido, el supuesto matrimonio es nulo o anulable, es decir, es nulo *ab initio* o potencialmente nulo *ab initio.* Cuando un supuesto matrimonio es nulo *ab initio,* no se pueden adquirir derechos civiles mediante el mismo, y puede ser investigado en cualquier corte en que se alegue que se han adquirido derechos por virtud del mismo, aun después de la muerte de uno o de ambos de los contrayentes. Sin embargo, cuando el matrimonio es meramente anulable, es válido para todos los fines civiles hasta que su nulidad haya sido declarada por una corte de jurisdicción competente, lo que puede hacerse únicamente en vida de los contrayentes, siendo el matrimonio válido *ab initio,* para todos los fines, tan pronto muere cualquiera de los cónyuges. Según el derecho civil codificado, se dispone que cuando de buena fe se contrae un matrimonio nulo,

el contrayente o los contrayentes que han actuado de buena fe y su prole adquieren derechos civiles.

"El llamado matrimonio nulo no puede ser convalidado por una ratificación de los contrayentes; la regla es distinta cuando se trata de matrimonios anulables."

La tendencia que se ve en la jurisprudencia americana es sostener la integridad del matrimonio en todos aquellos casos de incapacidad en que el efecto es de hacer solamente anulable el matrimonio. Si el tiempo o las circunstancias posteriores subsanan la incapacidad o la hacen desaparecer, el matrimonio se mantiene válido. Los matrimonios contraídos por menores de edad pueden luego convalidarse. Estos, que no tuvieron el pleno ejercicio de su razón al tiempo de contraer matrimonio, algunas autoridades admiten que recobrándose la razón pueden ratificarse. Aun dentro de la prohibición, como penalidad, subsiguiente al divorcio para contraer un segundo matrimonio, las autoridades, como cuestión ilustrativa, han declarado:

"Pero aun cuando el matrimonio se considera completamente nulo, por haberse contraído dentro del tiempo prohibido por la ley, que sigue al divorcio de una de las partes, si hubo un matrimonio formal y los contrayentes continuaron viviendo juntos después de haber desaparecido el impedimento, el matrimonio puede ser considerado como válido, fundándose esta conclusión en la teoría de que se ha consumado un matrimonio conforme al derecho común, o en que existe una presunción incontrovertible de matrimonio." L.R. A. 1916 C, p. 752.

El mismo Código Civil Español en el artículo 50 prescribía que a pesar de la prohibición del artículo 45, *supra,* si se casaren las personas comprendidas en él, el matrimonio era válido y sólo establecía, como consecuencia de la infracción, ciertas reglas que establecían la absoluta separación de bienes entre los contrayentes y ninguno de los consortes podía recibir del otro cosa alguna por donación o testamento. Es verdad que esta disposición fué omitida en el nuevo Código, el que declara por el artículo 178 que "Es

nulo el matrimonio en el que no se hayan observado todos los requisitos exigidos por este Código." En el artículo 130 es donde se habla en general de esos requisitos, y prescribe así:

"Los requisitos necesarios para contraer matrimonio son:

"1. Capacidad legal de los contratantes.

"2. Consentimiento de las partes contratantes.

"3. Autorización y celebración de un contrato matrimonial mediante las formas y solemnidades prescritas por la ley."

En los artículos 131, 132, y 133 citados más antes, se especifican ciertas incapacidades para contraer matrimonio, incluyéndose entre ellas la que es objeto de esta acción. Se verá de su examen, como habíamos dicho, que no todas ellas causan la nulidad *ab initio* del matrimonio. Sería violentar el tenor del artículo 178 si se dijera que la prohibición que se impone a la viuda o a la mujer divorciada o cuyo matrimonio se hubiere declarado disuelto durante el término que fija la ley, es un requisito esencial para contraer matrimonio. En nuestro concepto solamente se trata de un impedimento sujeto a un hecho contingente que como tal, por la naturaleza del mismo, sería imposible sostener bajo las circunstancias concurrentes en este caso y sin perder de vista los principios generales del derecho o de equidad, que produjera la nulidad *ab initio* del matrimonio. En el caso de *Cabassa* v. *Nadal*, 23 D.P.R. 744, el hecho contingente del impedimento estaba latente al tiempo de solicitarse la nulidad del divorcio. La demanda se interpuso durante los 301 días subsiguientes a la sentencia de divorcio de la demandante; el peligro que deseaba prevenir la ley existía y ni la acción del tiempo acompañada de otras circunstancias, habían convalidado la unión de los contrayentes. El caso es distinto y no es aplicable.

Es conveniente advertir que como el juez inferior declaró probada la contrademanda, fundada en el abandono y en el adulterio del demandante y no se ha elevado una ex-

posición del caso ni transcripción de la evidencia, si bien por los fundamentos expuestos *debe revocarse la sentencia apelada* y dictarse otra que declare sin lugar la demanda, por otro lado, en relación con la contrademanda *debe devolverse el caso a la corte inferior para ulteriores procedimientos* no inconsistentes con esta opinión.

El Juez Asociado Sr. Hutchison no intervino.