GEORGE DENNIS y METRO INVESTORS CORP., ETC., demandantes y recurridos, *v.* CITY FEDERAL SAVINGS AND LOAN ASSOCIATION, demandado; MONIQUE LACOMBE y MONIQUE LACOMBE ADVERTISING, INC., demandados y recurrentes.

*Número:* RE-86-3 *Resuelto:* 5 de mayo de 1988

---

*Gladys E. Guemarez* y *Alvaro R. Calderón, Jr.*, de *Alvaro R. Calderón, Jr. & Teresita Picó Vidal*, abogados de los recurrentes; *Nelson Rivera Cabrera*, abogado de los recurridos; *Carlos M. Maldonado Casillas*, de *O'Neill & Borges*, abogado del demandado City Federal Savings and Loan Association.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Este caso nos brinda la oportunidad de analizar las figuras de la persona intermedia del Art. 1348(2) del Código Civil, 31 L.P.R.A. sec. 3773(2), del contrato en daño de terceros y del contrato de promesa bilateral de compra y venta.

I

*Los hechos*

La Metro Investors Corp. (en adelante Metro) y el Sr. George Dennis instaron una acción contra City Federal Savings and Loan Association (en adelante City), la Sra. Monique Lacombe y Monique Lacombe Advertising, Inc. (en adelante Advertising), mediante la cual solicitaron el cumplimiento específico de un contrato de opción a compra y los daños sufridos.

El 12 de diciembre de 1978 Metro adquirió mediante compra, de City, el apartamento 2-B del Condominio Condado Astor (en adelante Condominio) para operar un negocio

de cine, Cinema 2.(1) Desde poco antes de adquirirlo, Metro le había mostrado interés a City en comprar también el apartamento 2-A para convertirlo en otro negocio de cine. Por tal razón, el Sr. Alfred Hedden, en su capacidad de Presidente de City, y el señor Dennis, en representación de Metro, convinieron verbalmente que City garantizaría a Metro el derecho a optar por la compra del apartamento 2-A dentro del término de seis (6) meses, contados a partir del comienzo de operaciones del Cinema 2. La opción reconocía, dentro de ese plazo, la primera oportunidad de aceptar o declinar la oferta de cualquier otro comprador interesado (*right of first refusal*). Posteriormente, el Sr. José E. Alegría, agente de City que tenía a cargo la administración y venta de los apartamentos 2-B y 2-A, le ratificó a Metro este acuerdo.(2)

Así las cosas, y como parte de los preparativos para adquirir el apartamento 2-A, Metro gestionó la preparación de un plan para instalar allí su negocio de cine. Este plan se concluyó el 8 de enero de 1979 y fue sometido a la Administración de Reglamentos y Permisos. El 2 de febrero de 1979, en la inauguración del Cinema 2, al señor Alegría y su entonces esposa señora Lacombe, conversaron con el señor Dennis sobre los preparativos para la futura instalación del Cinema 3 en el apartamento 2-A.

El 12 de marzo de 1979 la señora Lacombe y City suscribieron un acuerdo (*sale contract*), mediante el cual la señora Lacombe se comprometía a comprar, por sí o a través de Advertising, y City a vender, el apartamento 2-A dentro del

---

(1) La Metro Investors Corp. (en adelante Metro) también operaba en el apartamento 1-C del Condominio Condado Astor (en adelante Condominio) otro negocio de cine, Cinema 1.

(2) City Federal Savings and Loan Association (en adelante City) tenía su oficina principal en New Jersey y se mantenía al tanto de las propiedades en Puerto Rico a través del Sr. José E. Alegría.

término de noventa (90) días, contados a partir de la firma del contrato.(³)

El 10 de abril de 1979 el señor Dennis notificó por escrito a City su decisión de ejercitar la opción a compra del apartamento 2-A. El 7 de mayo de 1979 el Sr. Charles B. Mallon, vicepresidente de City, contestó esta comunicación y negó la existencia de la opción a compra reclamada. Expresó lo siguiente:

> I have reviewed the documents in connection with your purchase of property from City Federal and I cannot find any evidence of an agreement or an option which I am sure would have been documented had it been finalized. If you have anything in writing which would throw some light on this I would certainly appreciate . . . .

El 30 de mayo de 1979 Metro y el señor Dennis presentaron en el Tribunal Superior, Sala de San Juan, una demanda contra City, la señora Lacombe y Advertising, mediante la cual solicitaron el cumplimiento específico del contrato de opción y los daños experimentados por el alegado incumplimiento.(⁴)

El 15 de febrero de 1980 Advertising y City firmaron la escritura de compraventa.

---

(³) Sobre el término para llevar a cabo la transacción de compraventa, el contrato disponía específicamente:

"FIRST: Within ninety (90) days after the date of signing of this Contract, to be counted from the latest day of signing by one of the parties, if both do not sign on the same date, or as soon as the improvements described below have been executed but no sooner than said ninety (90) days, the Seller agrees to sell and the Purchaser agrees to buy the Property for the sum of ONE HUNDRED SIXTY THOUSAND DOLLARS ($160,000.00) (purchase price) subject to the following conditions:"

(⁴) Como resultado de esta demanda se instaron otras reclamaciones relacionadas con la misma: City reconvino contra Metro y el señor Dennis; la señora Lacombe, su esposo, el señor Alegría, y Monique Lacombe Advertising, Inc. (en adelante Advertising) reconvinieron contra Metro y el señor Dennis; Advertising instó demanda contra coparte contra City y, finalmente, City reconvino contra Advertising.

El tribunal de instancia dictó sentencia que decretó la nulidad de la transacción habida entre Advertising y City; reconoció la validez del contrato de opción verbal entre Metro y City; dispuso un término para ejercitar la opción, y condenó a los demandados al pago de costas y a los codemandados, City y la señora Lacombe, al pago de honorarios.[5]

Las codemandadas recurrentes Advertising y la señora Lacombe presentaron recurso de revisión ante este Tribunal en el cual plantearon la comisión de cuatro (4) errores: (1) que el tribunal de instancia erró al aplicar el Art. 1348(2) del Código Civil, *supra*, y decretar la nulidad de la compraventa; (2) que erró al resolver que la compraventa era nula por el conocimiento personal que pudiera tener la señora Lacombe de la existencia de un acuerdo verbal de opción entre el señor Dennis y City; (3) que erró al no proveer a la devolución de las prestaciones entre las partes luego de anular el contrato de venta, y (4) que erró al condenar a la señora Lacombe individualmente al pago de honorarios de abogado.

Después de decidir revisar, expedimos el recurso y le indicamos a las partes que, además de discutir los planteamientos formulados en el recurso, nos ilustraran sobre la aplicación o no de la figura del contrato en daño de tercero a los hechos específicos del caso.

## II

*La figura de la persona intermedia del Art. 1348(2) del Código Civil*

En la sentencia, el tribunal de instancia determinó que la facultad representativa del señor Alegría lo constituía en mandatario para propósitos de la prohibición de compra del Art. 1348(2) del Código Civil, *supra*:

---

[5] Condenó a City y a la señora Lacombe al pago de mil quinientos dólares ($1,500), cada uno a favor de Metro y del señor Dennis.

No podrán adquirir por compra, aunque sea en subasta pública o judicial, por sí ni por persona alguna intermedia:

. . . . . . . .

2. *Los mandatarios, los bienes de cuya administración o enajenación estuviesen encargados.* (Énfasis suplido.)

Además, concluyó que la señora Lacombe y Advertising estaban íntimamente ligados al señor Alegría en el contrato de compraventa y que, por lo tanto, estaban también sujetos a dicha prohibición.

Los demandados recurrentes alegan que el foro de instancia, a la luz de los hechos particulares de este caso, erró al determinar que la prohibición del Art. 1348(2) del Código Civil, *supra*, era aplicable. Arguyen que "el mandatario señor Alegría no adquirió por compra la propiedad del mandante por sí ni por persona alguna intermedia, ni fue el destinatario final de los efectos del negocio . . . [y que] el propio mandante fue el que compareció a vender directamente a [Advertising] y no se perjudicó en nada con dicha transacción". Relación de hechos, pág. 5. Les asiste la razón.

██ En relación con el Art. 1348(2) del Código Civil, *supra*, hemos resuelto que su propósito es evitar el "fraude o engaño con que hubiera obrado el administrador . . .", *Zayas v. Orraca*, 80 D.P.R. 339, 345 (1958); que su "espíritu es impedir fraude y en determinado caso proteger a los mandantes", *Oxios v. Registrador*, 39 D.P.R. 447, 453 (1929); que "es de interpretación restringida y no cabe aplicarse extensivamente, ni aun por razón de analogía, a personas y cosas que no comprende", *Zayas v. Orraca*, supra; *Vázquez v. Martínez et al.*, 17 D.P.R. 1134, 1145 (1911); *Martínez v. Registrador de San Germán*, 26 D.P.R. 559, 561 (1918); *Silva Hno. & Cía. v. El Reg. de San Juan, Sec. 1a.*, 28 D.P.R. 177 (1920), y que, debido al carácter prohibitorio del precepto, "no se ha extendido en cuanto a su aplicación más que aquellos casos que caen claramente bajo su letra . . .". *Piazza v.*

*Piazza*, 83 D.P.R. 414, 423 (1961). Este artículo enumera varias "modificaciones de la capacidad para adquirir por compra", *Zayas v. Orraca*, supra, entre las cuales se encuentra la del mandatario en relación con los bienes que, en el momento de realizarse la venta, estén bajo su administración o sujetos a su facultad para enajenarlos. "Esta prohibición hace imposible la autocontratación o contrato consigo mismo y produce una incapacidad especial o relativa." *Zayas v. Orraca*, supra. Sin embargo, el contrato así ejecutado es ratificable y la acción para pedir su nulidad, prescriptible. Véanse: *Oxios v. Registrador*, supra, pág. 451; *Bengoa v. El Registrador de la Propiedad*, 14 D.P.R. 107, 109 (1908); *Ledesma et al. v. Agrait et al.*, 19 D.P.R. 566, 568 (1913); *Turner v. El Registrador de San Juan*, 22 D.P.R. 573 (1915); *Seoane v. El Registrador*, 23 D.P.R. 810, 813 (1916); *Castelló et al. v. Pérez et al.*, 23 D.P.R. 763, 770 (1916).

■ Al comentar el Art. 1.459(2) del Código Civil español, que equivale a nuestro Art. 1348(2) del Código Civil, *supra*, Manresa nos dice que "[l]a razón que abona este precepto . . . es una razón de moralidad. La ley ha querido evitar, en cuanto sea posible, toda ocasión de fraude, de engaño o de perjuicio. Siendo una razón de moralidad la que inspira el artículo, la materia sobre que recae afecta al orden público, y, por lo tanto, sus disposiciones no son renunciables". J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, 6ta ed. rev., Madrid, Ed. Reus, 1969, Vol. 1, T. X, pág. 183.

Al tener en cuenta estos principios generales, pasemos ahora a considerar si Advertising era una "persona intermedia", a tenor con el Art. 1348(2) del Código Civil, *supra*, mediante la cual el mandatario, señor Alegría, adquirió bienes que estaban bajo su administración. Díez-Picazo nos señala que el análisis de esta figura debe enmarcarse en la finalidad del artículo de "declarar ineficaz una simulación" y que para

comprender su alcance "es necesario recordar la distinción que la doctrina común establece entre la interposición ficticia y la interposición real de persona". En relación con la interposición ficticia de persona, nos indica que "las partes del negocio están conformes en que éste surta entre ellas todos sus efectos, pero interponen a un tercero, con quien el negocio se simula celebrado, a fin de ocultar la participación que en él ha tenido uno de los verdaderos contratantes". En cuanto a la interposición real de persona, indica que "el intermediario es un verdadero contratante" y que ésta presupone un acuerdo entre el que promueve la interposición y la persona interpuesta; no siendo necesario que el que contrata con la persona interpuesta participe en el acuerdo de interposición. "Entre el promotor de la interposición y la persona interpuesta [deberá existir] una relación jurídica previa que puede ser un mandato o un pacto de fiducia, según los casos." L. Díez-Picazo, *La prohibición de comprar impuesta a los mandatarios*, 18 (Núm. 3) An. Der. Civ. 660–661 (1965).

█ De todo lo anterior, Díez-Picazo, *op. cit.*, pág. 661, deduce que:

> la "persona intermedia" del artículo 1.459 C.c. [Art. 1348 C.c. de P.R.] es un caso de *interposición real* de persona y no un caso de simulación o de interposición ficticia . . . . La "persona intermedia" . . . es un fiduciario o un mandatario del interesado en comprar: un "intermediario" en el sentido riguroso de esta palabra. Mas ello significa que el artículo 1.459 no veda en términos absolutos que el mandatario compre los bienes que fueron de su mandante al primer adquirente de éste, quienquiera que sea, sino solamente cuando este *primer adquirente realizó la adquisición por encargo suyo, es decir, cuando existió entre ambos una previa relación jurídica en virtud de la cual la adquisición se llevó a cabo.* En cambio, cuando el primer adquirente ha sido una persona totalmente extraña, la posterior compra es perfectamente válida.

Esta posición ha sido acogida con aprobación por R. Badenes Gasset, *El Contrato de Compraventa*, 2da ed., Barce-

lona, Librería Bosch, 1979, Vol. I, págs. 424–425, y por M. Albaladejo, *Coméntarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1980, T. XIX, pág. 129. Este último añade que "se trata de un intermediario en el sentido riguroso del término, quien actuando *proprio nomine* estaba previamente vinculado por el sujeto vetado para llevar a efecto la adquisición". Albaladejo, *op. cit.*

Delimitado así el derecho aplicable, le corresponde al impugnante probar el hecho de que existía la relación jurídica previa y el acuerdo de interposición. Véanse: Manresa y Navarro, *op. cit.*, pág. 199; Díez-Picazo, *op. cit.* No existe razón alguna para alterar las reglas normales de distribución de la carga de la prueba. Díez-Picazo, *op. cit.* La "vinculación ha de ser probada por quien impugna la compra, sin que existan en nuestro Derecho presunciones de ningún tipo". Albaladejo, *op. cit.*

Al aplicar estas normas doctrinales al caso de autos encontramos que, primeramente, tenemos que determinar si al momento en que Advertising adquirió el apartamento 2-A el mandatario, señor Alegría, era la persona interesada o destinatario final de dicha propiedad. De contestarse esta interrogante en la afirmativa, entonces debemos resolver si la adquisición de la propiedad por Advertising se hizo en cumplimiento de un *encargo* o de una *relación jurídica* (mandatario o fiduciario, por ejemplo) acordada con el señor Alegría.

El récord de este caso refleja que el señor Alegría nunca adquirió la propiedad en controversia. No hay prueba que demuestre que éste tenía algún interés personal en la misma. El señor Alegría no era dueño accionista de Advertising; las acciones de la corporación pertenecían privativamente a la señora Lacombe. A lo sumo, sólo podría decirse que el señor Alegría obtuvo un beneficio indirecto por ser éste, en aquel entonces, esposo de la señora Lacombe. Tampoco hay

prueba en el récord de que hubo un acuerdo entre el señor Alegría y Advertising para adquirir la propiedad ni de que existiera una relación jurídica previa entre las partes con el propósito de que posteriormente el señor Alegría adquiriera la propiedad objeto de este litigio.

■ La única función que realizó el señor Alegría como oficial de la corporación, en relación con esta transacción, fue la de certificar la resolución de la junta de directores que autoriza la compra de la propiedad en controversia.(6) No existe prueba de que el señor Alegría tuviera poder decisional en la corporación. En *Sabalier v. Iglesias*, 34 D.P.R. 352, 359 (1925),(7) señalamos que el Art. 1348(2) del Código Civil, *supra*, no prohíbe la compra de bienes por una corporación por el hecho de ser accionista de la misma el mandatario del vendedor:

> La razón de esta jurisprudencia es porque una corporación, como creación artificial de la ley, es distinta de sus miembros o accionistas. La individualidad de éstos desaparece y es absorbida por el capital social y ellos no son ni privada ni conjunta-

---

(6) El señor Alegría, como Secretario de Advertising, tenía un deber de fiducia para con dicha corporación. Sin embargo, este deber no es recíproco entre esta persona natural y la persona jurídica. No existía entre el señor Alegría y Advertising una relación jurídica de tipo tal que se pueda catalogar a la corporación como mandataria o fiduciaria del señor Alegría para propósitos de la adquisición del apartamento 2–A.

Sobre la relación fiduciaria de los directores y oficiales de una corporación, en *Epstein v. F. & F. Mortgage Corp.*, 106 D.P.R. 211, 224 (1977), señalamos: "No hay duda de que existe una relación de fiducia entre un director y la corporación, por lo que no debe tal oficial asumir posiciones contrarias a los intereses de la corporación. Sin embargo y a pesar de la naturaleza del puesto que ocupa, un director no está impedido de entrar en negocios similares, siempre que actúe de buena fe y se abstenga de interferir con los negocios de la corporación, especialmente cuando no existe un acuerdo de no competir . . . . El Estado de Delaware también ha adoptado el mismo principio, concediéndole amplia libertad a oficiales y directores de una corporación para desarrollar todo tipo de negocio." (Citas omitidas y énfasis suplido.)

(7) Este caso hace referencia al Art. 1362(2) del Código Civil de 1902, el cual equivale al Art. 1348(2) del presente Código Civil, 31 L.P.R.A. sec. 3773.

mente dueños de su propiedad. Se ha llegado a decir por las autoridades que ni una parte ni todas las personas naturales que componen una corporación o quienes sean dueños del capital social o controlen sus negocios, son la corporación misma y si un solo individuo forma una corporación, él mismo no es la corporación: en tales casos el hombre es una persona y la corporación es otra.

■ Concluimos que Advertising no era "persona intermedia" del mandatario señor Alegría según el Art. 1348(2) del Código Civil, *supra*. Además, aun cuando pudiese considerarse a Advertising como "persona intermedia" del mandatario señor Alegría, la negociación de la compra de los bienes en administración fue hecha directamente con el mandante. Nuestra jurisprudencia es clara en cuanto a que el Art. 1348(2) del Código Civil, *supra*, no prohíbe una venta directa entre mandante y mandatario:

> . . . cuando el mismo mandante vende los bienes a su mandatario ello tiene el efecto de hacer cesar el mandato y desaparece así el motivo legal de la incapacidad que consiste en que el mandatario forma con el mandante una sola persona jurídica. *Piazza v. Piazza*, supra, pág. 425.(8)

## III

*Contrato en daño de tercero*

■ Pasemos ahora a considerar la responsabilidad de Advertising y de la señora Lacombe hacia Metro. La figura aplicable es la de contrato en daño de tercero. En *Gen. Office Prods. v. A.M. Capen's Sons*, 115 D.P.R. 553 (1984), seña-

---

(8) Refiéranse, también, a: *Mancheño v. Le Brun et al.*, 14 D.P.R. 474, 482 (1908); *Zayas v. Orraca*, 80 D.P.R. 339, 346 (1958); *Silva Hno. y Cía. v. El Reg. de San Juan, Sec. 1a.*, 28 D.P.R. 177, 181 (1920). L. Díez-Picazo, *La prohibición de comprar impuesta a los mandatarios*, 18 (Núm. 3) An. Der. Civ. 660, 661 (1965), señala que dicho artículo "no prohíbe una venta directa de mandante a mandatario, un acuerdo simulatorio en el que tomara parte el mandante no tendría sentido para eludir la prohibición [de persona intermedia] . . .".

lamos que la figura del contrato de daño de tercero se reconoce en España y que es afín y análoga a la figura de interferencia torticera con una relación contractual.

 Es principio estatutario que "[l]os contratos sólo producen efecto entre las partes que los otorgan y sus herederos . . .". Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3374. "Las acciones 'ex-contractu' . . . sólo pueden ser ejercitadas por una parte contratante en contra de la otra." *Suárez v. Hernández*, 56 D.P.R. 276, 283 (1940). La regla general es que en relación con un tercero un contrato es irrelevante, ya que éste simplemente regula las relaciones entre las partes contratantes y al tercero ni siquiera le afecta. L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 281. "Dentro del cuadro de excepciones al principio general de la eficacia relativa del contrato y como uno de los supuestos en que un contrato puede producir efectos en relación con los terceros, pueden situarse los llamados 'contratos en daño de tercero'." L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed. rev., Madrid, Ed. Tecnos, 1982, Vol. II, pág. 108; Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial, op. cit.*, pág. 280; J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 264; A. Gullón Ballesteros, *En torno a los llamados contratos en daño de tercero*, 20 Rev. Der. Not. 111 (1958); A.V. Ch. Colin y H. Capitant, *Traité de Droit Civil*, Paris, Libraire Dalloz, 1959, T. II, págs. 533–536; B. Starck, *Droit Civil: Obligations*, Paris, Libraires Techniques, 1972, págs. 580–583.

 Díez-Picazo y Gullón definen la figura de contrato en daño de tercero de la manera siguiente:

> Se alude con esta denominación [contrato en daño de tercero] a las hipótesis en que al celebrar un contrato, y precisamente a causa de su celebración, los contratantes ocasionan un daño

a una tercera persona, y ello tanto si son conscientes del mismo como si es uno de ellos el que exclusivamente desea o es consciente de la producción del daño. Díez-Picazo y Gullón, *op. cit.*, pág. 133. Véanse, también: Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial, op. cit.*; Puig Brutau, *op. cit.*; Gullón Ballesteros, *op. cit.*, pág. 115.[9]

■ Para que exista un contrato en daño de tercero es necesario que se den los requisitos siguientes: (1) que haya un tercero afectado; (2) que se haya causado un daño a esa tercera persona; (3) que medie un nexo causal entre el daño y el contrato, y (4) que medie la intención de causar daño, ya sea de ambos contratantes o de uno solo de ellos.

## A. *El tercero afectado*

■ Gullón nos indica que para ser tercero afectado se requiere no solamente que se haya permanecido extraño a la relación contractual formada, sino que también es necesario que el tercero se encuentre "vinculado a las partes o a una de ellas por una relación jurídica que es dañada mediante aquélla, o bien se encuentra en una situación de dependencia con

---

[9] La figura de contrato en daño de tercero comprende varios posibles supuestos en donde la misma se dará:

"*Supuesto A*) Tercero ligado por una relación jurídica anterior al contrato dañoso con una de las partes contratantes.

"Puede ocurrir en la celebración de aquél los siguientes hechos:

"*a*) El sujeto ligado por la relación jurídica contrata con una tercera persona contra el contenido de la misma, lesionando los derechos del otro sujeto de la relación. *Así, por ejemplo, si A ha concedido una opción de compra a B y antes de terminar el plazo de duración, venda la cosa a C.*

"*b*) La tercera persona que contrata con aquel sujeto no desconoce la relación anterior, pero celebra el contrato a fin de vulnerarla. *En el ejemplo anterior, C conoce la opción y compra la cosa.*

"*c*) Contratos dirigidos a perjudicar a un tercero agravando su posición, bien exista acuerdo entre los contratantes o no. Caso típico es la enajenación fraudulenta de bienes.

"*Supuesto B*) Contrato celebrado por las partes con intención de vulnerar los derechos o intereses legítimos de un tercero." (Énfasis suplido.) A. Gullón Ballesteros, *En Torno los llamados a contratos en daños de tercero*, 20 Rev. Der. Not. 111, 130–131 (1958).

el contrato dañoso de causa a efecto".(10) Lo fundamental es la incompatibilidad entre la posición jurídica de los terceros afectados y la que deriva del contrato celebrado.

En el caso de autos la posición jurídica que tenía Metro en el contrato de opción con City era radicalmente incompatible con la relación jurídica derivada del contrato de compraventa celebrado entre City y Advertising. El contrato de compraventa dañó la relación jurídica que emanaba del contrato de opción entre Metro y City.

## B. *El daño*

■ Para que exista un contrato en daño de tercero tiene también que haber un daño causado por dicho contrato al tercero afectado. Sobre este particular nos dice Díez-Picazo que "[u]n 'daño' es una lesión o violación de un concreto derecho subjetivo. No hay por ello daño de terceros si simplemente son colocados en situación desfavorable intereses que no son especialmente protegidos".(11) Gullón Ballesteros, a su vez, indica que el daño "es la disminución o sustracción de un bien jurídico . . . lesión de un interés legalmente tutelado".(12) Díez-Picazo y Gullón, *op. cit.*, pág. 133, expresan que:

> La problemática de estos contratos nace especialmente cuando se violan derechos subjetivos de créditos de terceros, que sufren las consecuencias perjudiciales de los mismos. Admitido ya sin discusión por la doctrina y jurisprudencia el deber de respetar las situaciones jurídicas ajenas (obligacionales o reales), es evidente la posibilidad de que un contrato lesione las mismas cuando uno de los contratantes es sujeto de

---

(10) Gullón Ballesteros, *op. cit.*, pág. 122.

(11) L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 281. Refiéranse, también, a L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed. rev., Madrid, Ed. Tecnos, 1982, págs. 133–134.

(12) Gullón Ballesteros, *op. cit.*, pág. 127.

aquel derecho de crédito (el exclusivista, que es perjudicado porque el que le concedió la exclusiva de venta está vendiendo a otros en la zona reservada . . . ).

En el caso de autos el contrato de compraventa entre City y Advertising afectó el derecho "personal" o de "crédito" de Metro constituido en el contrato de opción.[13]

Como resultado del contrato de compraventa el derecho de crédito de Metro quedó transgredido, se eliminó la "reserva exclusiva del derecho" a comprar el apartamento 2-A el cual era el "objeto de la opción". *Rosa Valentín v. Vázquez Lozada*, 103 D.P.R. 796, 807 (1975).

## C. *Nexo causal entre el daño y el contrato*

■ La producción del daño tiene que ser una consecuencia directa e inmediata del contrato. "El contrato propiamente en daño de tercero . . . [va] dirigido directamente a la producción del efecto perjudicial." Puig Brutau, *op. cit.*, pág. 264. En el caso de autos no cabe duda que el daño ocasionado, la imposibilidad del cumplimiento con la opción entre Metro y City, y los posibles daños dimanantes de este incumplimiento fueron productos directos e inmediatos del

---

[13] J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1978, T. II, Vol. II, pág. 64.

Díez-Picazo diferencia el derecho de crédito del derecho real de la manera siguiente:

"La doctrina tradicional acostumbra a comenzar el estudio de los derechos subjetivos de naturaleza patrimonial aludiendo a la distinción clásica de los mismos en dos grandes tipos o especies, a los cuales se califica respectivamente como derechos reales y derechos personales o de crédito. Como dice Pugliese, la expresión de 'derechos reales' indica aquella categoría de derechos partrimoniales, que se caracteriza, según la opinión común, por consistir en un poder inmediato del titular sobre una cosa. Derechos reales (res-cosa) quiere decir justamente, según la opinión común, derechos sobre las cosas. Por el contrario, los derechos personales o de crédito son aquellos que atribuyen a su titular un poder que le permite dirigirse a otra persona y reclamar de ella una acción o una omisión. . . . El paradigma de los derechos personales, por el contrario, sería el derecho del acreedor a reclamar por ejemplo una suma de dinero." Díez-Picazo, *op. cit.*, pág. 51.

contrato de compraventa celebrado entre City y Advertising.

D. *Intención de causar daño*

■ Como cuarto y último requisito encontramos que debe mediar intención de causar daño, ya sea de parte de "ambos contratantes, o de sólo uno de ellos". Puig Brutau, *op. cit.* Sobre el particular, Gullón señala:

> A nuestro juicio, cabe *excluir de la responsabilidad* todos aquellos supuestos en los que pudiera jugar la idea de culpa o negligencia. Consistiendo ésta en la omisión de la debida diligencia . . . [a]firmar lo contrario sería . . . reconocer que cualquier contrato invade la esfera jurídica de los terceros ajenos al mismo, en cuanto les impone una obligación como la reseñada. En relación con esa pretendida diligencia, expresa CARRARO su disconformidad. De un lado . . . no sería configurable una responsabilidad del tercero por el hecho de no haber investigado a fin de determinar si su actividad fué contraria al derecho de crédito de otro, puesto que la *vida moderna de tráfico no consiente que el deber de diligencia sea llevado hasta tal extremo.* . . . (Énfasis suplido.) Gullón Ballesteros, *op. cit.*, pág. 150–151.

A tenor con lo anterior, es prudente que adoptemos la norma del caso de *Gen. Office Prods. v. A.M. Capen's Sons*, supra, pág. 559, de que "basta a tal efecto con que el perjudicado pruebe o presente hechos que permitan inferir que . . . actuó *intencionalmente*, con conocimiento de la existencia del contrato" (énfasis suplido) o la relación jurídica del tercero. En el caso de autos, tanto City como Advertising tenían conocimiento del contrato de opción de Metro. Concluimos que, al actuar con conocimiento de la existencia del contrato de opción entre Metro y City, tenían la intención de causar el daño.

## E. *Consecuencias*

 Luego de analizar los diferentes elementos de la figura de contrato en daño de tercero, debemos atender las consecuencias jurídicas dimanantes de la misma. La responsabilidad de City, el "sujeto pasivo del derecho subjetivo lesionado", es una clara responsabilidad contractual por incumplimiento de contrato.(14) Díez-Picazo y Gullón, *op. cit.*, pág. 133. Bajo la figura de contrato en daño de tercero consideraremos las consecuencias que repercuten en la esfera jurídica ajena y la responsabilidad del que contrata con el que es sujeto pasivo del derecho subjetivo lesionado. Gullón Ballesteros, *op. cit.*, pág. 117. Esta responsabilidad "debe establecerse en función de que conociese o no que se producía la lesión, respondiendo en el primer supuesto en base al [Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141] . . .". Díez-Picazo y Gullón, *op. cit.* "El contrato regula simplemente las relaciones entre las partes contratantes. Al tercero el contrato, en cuanto tal contrato, ni siquiera le afecta. Podrá, únicamente, coexistir con el contrato un acto ilícito que es la causa del daño. *Pero este ilícito estará sometido a la disciplina general de la responsabilidad aquiliana.*" (Énfasis suplido.) Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial, op. cit.*, pág. 281.

 La figura de contrato en daño de tercero involucra dos (2) supuestos bajo los cuales los contratantes ocasionan el daño a una tercera persona y, dependiendo del supuesto, se producen consecuencias jurídicas diferentes. "Cabe, en primer lugar, pensar que en todos aquellos casos en que ambos contratantes se conciertan para ocasionar un daño al

---

(14) La lesión que estudiamos en la figura de contrato en daño de tercero "es producida, no por el sujeto pasivo de la relación o derecho personal —ya que desde ese punto de vista estaríamos dentro del incumplimiento contractual . . .". Gullón Ballesteros, *op. cit.*, pág. 132.

tercero, el contrato tiene causa ilícita y que, por consiguiente, esta circunstancia acarrea la nulidad del mismo. La nulidad puede ser solicitada por el tercero perjudicado, quien de esta manera puede poner fin a la lesión que mediante el contrato se le produce." Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial, op. cit.* Refiéranse, también, a Puig Brutau, *op. cit.*, pág. 109.

El caso de autos enmarca dentro de este supuesto, ya que ambos contratantes conocían del contrato de opción preexistente, por lo tanto, tenían la intención de causar el daño. El Art. 1227 del Código Civil, 31 L.P.R.A. sec. 3432, señala que "'[l]os contratos sin causa, *o con causa ilícita*, no producen efecto alguno [y que es] ilícita la causa *cuando se opone a las leyes o a la moral.*'" (Énfasis en el original.) *Serra v. Salesian Society*, 84 D.P.R. 322, 333–334 (1961). En *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 182 (1985), expresamos que "[e]s ilícita la causa cuando se opone a las leyes o a la moral [cuando se] trata de una lesión a un interés general de orden jurídico o moral". Díez-Picazo nos define la ilicitud de la causa de la manera siguiente:

> Hay, pues, dos tipos de causa ilícita: la causa ilegal, que se opone a las leyes, y la causa *inmoral*, llamada también 'causa torpe', que se *opone a la moral y buenas costumbres.*
>
> . . . . . . . .
>
> [C]abe aplicar la idea de causa ilícita en todos aquellos casos en que el contrato per se sea lícito y lo que le tiña de ilícito sea la finalidad empírica propuesta por las partes . . . .
>
> . . . . . . . .
>
> *Es ilícita la causa no sólo cuando el contrato per se es prohibido, sino cuando mediante él se trata de ocasionar a otra un daño o un perjuicio . . .* cuando se pretende cometer un fraude . . . . (Énfasis suplido.) Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial, op. cit.*, pág. 168.

En el caso que tenemos ante nuestra consideración no cabe duda que el contrato celebrado entre City y Adver-

tising no encierra "elemento de directa antijuridicidad". Sin embargo, está revestido de un matiz inmoral, ya que los otorgantes eran conscientes de que con sus actuaciones perjudicaban el derecho de un tercero, Metro. "En estricta técnica jurídica, un contrato celebrado entre sujetos que son conscientes de que a través de él lesionan un derecho ajeno es un contrato con causa ilícita, por lo que el perjudicado estará legitimado para solicitar su nulidad absoluta. Actúan con dolo porque, a pesar de ser conscientes de las consecuencias de su acto, lo celebran."(15) (Énfasis suplido.) Díez-Picazo y Gullón, *op. cit.*, pág. 134.

■ Sobre este particular, en *Franceschi et al. v. Sambolín et al.*, 10 D.P.R. 114, 120 (1906), señalamos:

. . . [El] . . . Código Civil . . . al establecer *"que pueden ejercitar la acción de nulidad de los contratos los obligados personal ó subsidiariamente por virtud de los mismos,"* no *excluye el derecho de* ejercitarlas aquellos terceros á quienes perjudica la obligación, como lo había ya declarado el mismo Tribunal Supremo de España en sentencia de 23 de septiembre de 1895 . . . . (Énfasis suplido y en el original.)(16)

■ El tercero lesionado también tiene derecho al resarcimiento por los daños que se le hayan causado si la nuli-

---

(15) El Tribunal Supremo de España, en su sentencia de 19 de mayo de 1981 (Repertorio de Jurisprudencia Civil Núm. 2081), al examinar un caso similar al de autos expresó lo siguiente:

". . . son nulos los contratos con causa ilícita, como ya en diversos casos ha reconocido esta Sala, así en sus sentencias del 30 de septiembre de 1929 y 12 de abril de 1946 (R. 418), haciendo consistir la causa ilícita en el propósito de los contratantes de perjudicar a tercero en beneficio propio, como acaeció en el supuesto ahora contemplado; debiendo estimarse existente tal *causa ilícita al reputar ineficaz, por exigencias ineludibles de carácter social y moral, todo contrato que persiga un fin ilícito, aunque en sí no encierre ningún elemento de directa antijuridicidad pero revistiendo la totalidad de lo convenido un matiz inmoral.*" (Énfasis suplido.)

(16) Dicho artículo corresponde al actual Art. 1254 del Código Civil, 31 L.P.R.A. sec. 3513, el cual señala que "[p]ueden ejercitar la acción de nulidad de los contratos los obligados principal o subsidiariamente en virtud de ellos".

dad no le ofrece un remedio suficiente para proteger el interés lesionado. La responsabilidad de indemnización por los perjuicios ocasionados, Díez-Picazo y Gullón entienden, debe ser solidaria. Díez-Picazo y Gullón, *op. cit.*, pág. 134. Gullón Ballesteros, *op. cit.*, págs. 157–158, señala:

> Creemos que una solución análoga [a la francesa] cabría dar en nuestro Derecho. Abonan la misma las siguientes consideraciones: existencia de un único perjuicio causado por las faltas de ambos, y la imposibilidad de determinar de manera exacta la responsabilidad que a cada uno le corresponde dentro del todo. La solidaridad, que refuerza en estos casos la posición del perjudicado, se deduce con lógica de la orientación de la sentencia del Tribunal Supremo de 21 de enero de 1933, que tiende a "la valoración de las condiciones o circunstancias que el buen sentido señala en cada caso como índice de responsabilidad dentro del infinito encadenamiento de causas y efectos". No cabe duda de que el criterio del juzgador se orientará en concreto, dada la libertad con que cuenta para resolver las cuestiones derivadas del nexo causal, hacia la equivalencia de las condiciones al presentarse en un mismo plano de consecuencias dañosas la falta contractual y extracontractual. Por lo demás, el principio de la no presunción de solidaridad parece referirse más bien a obligaciones que nazcan de la convención. Su aplicación a los supuestos de responsabilidad delictual es un tanto absurdo. Con ironía se expresaba MAZEAUD contra esta pretensión. "Si en un caso de más deudores contractuales —dice— se puede prever que el uno no cumplirá y puede tomarse la garantía estipulando la solidaridad, ¿cómo suponer que un tercero intervendrá para oponerse a la ejecución del contrato o para hacerse cómplice de la inejecución? La solidaridad es imposible de estipular también en los supuestos de deudores todos delictualmente obligados." Véanse también: *Leçons de Droit Civil, Obligations Théorie Générale*, Tome Deuxiene, Premier Volume, págs. 854 a 858 (1978); A. Weill, *Droit Civil: Les Obligations*, 10ma ed. rev., Francia, Ed. Dalloz, 1975, págs. 583–584.

En *Gen. Office Prods. v. A.M. Capen's Sons*, supra, págs. 558–559, discutiendo una figura de la interferencia con relaciones contractuales, llegamos a iguales resultados:

> La responsabilidad es de naturaleza extracontractual o cuasidelictual y se rige por sus términos . . . . La responsabilidad de quien interfiere con el contrato es *solidaria* con la responsabilidad del contratante que lo inejecuta a sabiendas.

. . . . . . . . .

> Es impertinente a estos efectos que el cocontratante del perjudicado haya tenido la intención de incumplir el contrato. Basta con que el tercero haya provocado o contribuido a la inejecución. En caso de concurrencia de culpas la responsabilidad es *solidaria*. (Énfasis suplido.)

Resolvemos, por lo tanto, que al constituir el contrato de compraventa entre City y Advertising un contrato en daño de tercero, donde ambos tenían conocimiento del contrato de opción verbal existente entre Metro y City, actuó correctamente el foro de instancia al decretar la nulidad de dicho contrato de compraventa.

### IV

*El contrato de promesa bilateral de compra y venta*

Los recurridos alegan también que el tribunal de instancia erró al resolver que la compraventa entre Advertising y City era nula debido al conocimiento personal que pudiera tener la señora Lacombe de la existencia del acuerdo verbal de opción entre el señor Dennis y City, y al no proveer a la devolución de las prestaciones entre City y Advertising luego de anular el contrato de compraventa.

Comenzaremos por indicar que el contrato de venta (*sale contract*) de 5 de abril de 1979, entre City como vendedora y la señora Lacombe como compradora, es en realidad un contrato de promesa bilateral de compra y venta preparatorio para el contrato de compraventa que finalmente se otorgó mediante escritura pública el 15 de febrero de 1980. En virtud de este contrato, City se comprometió a vender y la señora Lacombe[17] a comprar el apartamento 2–A, dentro del

---

[17] También se acordaron los términos de la forma de pago.

término fijo de noventa (90) días, por la cantidad de ciento sesenta mil dólares ($160,000). La señora Lacombe dio cinco mil dólares ($5,000) que se aplicarían al precio de venta y entró en posesión de la propiedad.

El contrato de promesa de vender o comprar se rige por el Art. 1340 del Código Civil:[18]

> La promesa de vender o comprar, habiendo conformidad en la cosa y en el precio, dará derecho a los contratantes para reclamar recíprocamente el cumplimiento del contrato.
>
> Siempre que no pueda cumplirse la promesa de compra y venta, regirá para vendedor y comprador, según los casos, lo dispuesto acerca de las obligaciones y contratos en el presente subtítulo.

En *Jordán-Rojas v. Padró-González*, 103 D.P.R. 813, 817–818 (1975), tuvimos la oportunidad de analizar este contrato. Allí dijimos:

> "El promitente sigue siendo el propietario a todos los efectos legales: conserva el derecho de administración y de disfrute *y si se vende la cosa a un tercero, éste se convierte en propietario y el beneficiario de la promesa solo podrá reclamar los daños y perjuicios. Esta solución se deriva del hecho de que la promesa bilateral de compra y venta no crea ningún derecho real, sino una simple obligación de hacer.* En otras palabras *el derecho del comprador eventual no es más que un derecho personal.*" (Énfasis en el original.)

En *Jordán-Rojas v. Padró-González*, supra, al igual que en el caso de autos, el dueño original de la propiedad, luego de otorgar un contrato de promesa de compraventa, otorgó un segundo contrato similar al primero sobre la misma propiedad con otras personas. En vista de lo anterior, los primeros contratantes presentaron una acción judicial exigiendo el cumplimiento específico de su contrato de promesa de

---

[18] 31 L.P.R.A. sec. 3747.

compraventa. Despúes de la presentación de la demanda y el emplazamiento, se hizo efectivo el segundo contrato de promesa de compraventa y las partes llevaron a cabo la transacción mediante escritura pública. A base de estos hechos concluimos que las partes del segundo contrato de promesa de compraventa carecían de un derecho real al momento de efectuar la compraventa:

> Ahora bien, surgiendo que *al momento de la radicación* y notificación de la demanda de los recurrentes exigiendo el cumplimiento específico de la promesa de vender y la nulidad de la suscrita por los esposos Padró, *no se había consumado la segunda promesa bilateral de compraventa* de Larco — pues hemos visto que la Escritura se otorga con posterioridad— forzoso es concluir que en dicha etapa, jurídica y factualmente era posible que se culminara la promesa ya convenida entre los recurrentes y Larco. Siendo contratos similares, no podían los recurridos hacer abstracción de tal realidad y descansar en la preferencia unilateral del vendedor. La presencia del elemento de buena fe de un tercero registral es al momento de hacer su adquisición pues es en dicha etapa que su voluntad se manifiesta a través del consentimiento.
>
> . . . . . . . . .
>
> Los demandados recurridos esposos . . . debidamente notificados de la acción en cumplimiento específico de contrato presentada por los recurrentes, no pueden oponer como defensa el precepto que nos ocupa. *Si bien se trata de una acción personal, es una encaminada a obtener en última instancia la modificación jurídica de carácter real*, y . . . "[n]o hay duda de que de triunfar el demandante en sus pretensiones de que se reconózca el ejercicio de su derecho . . . a la compra, el tribunal ordenaría el otorgamiento de la correspondiente escritura de compraventa sobre la propiedad en cuestión". (Énfasis suplido.) *Jordán-Rojas v. Padró-González*, supra, págs. 819–821.

El foro de instancia actuó correctamente al decretar la nulidad de la transacción habida entre Advertising y City, y al conceder tiempo para que Metro pudiese ejercitar su opción de tener la "primera oportunidad de aceptar o declinar

la oferta de cualquier otro comprador interesado".([19]) Una vez anulada la transacción relacionada con la venta inmueble, el apartamento 2–A del Condominio revertió al patrimonio de City, y Metro, el acreedor del contrato de opción, podía exigir el cumplimiento de forma específica por parte de City.

■ Declarada la nulidad del contrato, "los contratantes deben restituirse recíprocamente las cosas que hubiesen sido materia del contrato, con sus frutos, y el precio con los intereses . . .".([20]) Art. 1255 del Código Civil, 31 L.P.R.A. sec. 3514. Erró, pues, el foro de instancia al no proveer para la devolución de las prestaciones entre City y Advertising una vez anuló el contrato de compraventa.

---

([19]) El contrato de opción es una modalidad del contrato de promesa de compraventa. En *Rosa Valentín v. Vázquez Lozada*, 103 D.P.R. 796, 807–808 (1975), dijimos al citar a Castán que los requisitos esenciales del contrato de opción eran:

"'1ro. Concesión por una parte a la otra de la facultad de decidir sobre la celebración o no del contrato principal, sin obligación alguna de ésta . . . . 2. Concesión de modo exclusivo. 3. Por plazo cierto. 4. Sin otra condición que el propio juicio del optante.'

"'Los caracteres que lo distinguen son: ser un contrato preparatorio (una modalidad de la promesa de vínculo unilateral), aunque este punto es discutido; consensual, y generalmente unilateral, aunque pasa a ser bilateral cuando se fija una prima que ha de pagar el titular del derecho de opción al concedente del mismo.'"

Al citar con aprobación a Ossorio, expresamos que:

". . . el optante no está obligado a nada, que tiene 'libertad absoluta para tomar o no tomar la cosa ofrecida'."

([20]) Nótese que no se trata de un caso en el cual existe un contrato con causa torpe (que no constituye delito ni falta) producto de ambos contratantes, y uno de ellos pretende reclamar el cumplimiento de lo que dispone el Art. 1258 del Código Civil, 31 L.P.R.A. sec. 3517. Bajo estas circunstancias, ninguno de los contratantes podía exigir el cumplimiento del contrato; "que quien hace estado de su propia torpeza no merece ser atendido por los tribunales. El legislador prefiere que se mantenga la situación de hecho resultante del acto ilícito antes que dar acceso a los tribunales a la demanda de nulidad del acto contrario a la ley en el cual el demandante ha sido autor o copartícipe". *Rubio Sacarello v. Roig*, 84 D.P.R. 344, 352–353 (1962). Refiéranse, también, a *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 183 (1985). El caso de autos trata de un tercero inocente que fue perjudicado por el contrato y ejercita la acción de nulidad.

## ·V

*Honorarios de abogado*

■ El tribunal de instancia impuso a City y a la señora Lacombe el pago de mil quinientos dólares ($1,500), cada uno a favor de los demandantes recurridos Metro y señor Dennis. La Regla 44.1(d) de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que "[e]n caso que cualquier parte haya procedido con temeridad, el tribunal deberá imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado". Arguye la parte demandada recurrente que, como el inmueble objeto de esta controversia fue adquirido por Advertising y no por la señora Lacombe individualmente, no procedía el condenar a ésta última al pago de honorarios de abogado. No le asiste la razón.

Los hechos específicos de este caso reflejan que tanto la señora Lacombe como el ente corporativo Advertising actuaron con temeridad. No abusó, pues, el tribunal de instancia de su discreción al imponerle a la codemandada recurrente, señora Lacombe, el pago de honorarios de abogado. *Raluan Corp. v. Feliciano*, 111 D.P.R. 598, 601–602 (1981). Sin embargo, procede que modifiquemos la determinación del foro de instancia, en tanto y en cuanto dispone que la codemandada recurrente señora Lacombe pagará individualmente dichos honorarios. Los hechos claramente demuestran la temeridad conjunta de las codemandadas recurrentes señora Lacombe y Advertising. Se impone solidariamente a las codemandadas recurrentes señora Lacombe y Advertising el pago de los honorarios de mil quinientos dólares ($1,500).[21]

Por todo lo antes expuesto, *se dictará sentencia que modifique la dictada por el Tribunal Superior, Sala de San*

---

[21] No alteramos ni modificamos la cantidad de honorarios impuesta a City.

*Juan, de 29 de noviembre de 1985, para que se ordene la restitución recíproca de las prestaciones entre City y Advertising, y se condene solidariamente al pago de los mil quinientos dólares ($1,500) en honorarios de abogado a la señora Lacombe y a Advertising. Así modificada la sentencia, se confirmará y se devolverá el caso al tribunal de instancia para que continúen los procedimientos de forma compatible con esta opinión.*

El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita. Los Jueces Asociados Señores Negrón García y Alonso Alonso no intervinieron. El Juez Asociado Señor Hernández Denton se inhibió.

