RODRIGUEZ & DEL VALLE, INC.
Demandante-Apelado

v.

CHASE MANHATTAN BANK, N.A.
ASHFORD 1,000, INC.
Demandado-Apelante

Núm. KLAN-95-00401

San Juan, Puerto Rico, a 19 de junio de 1995

Panel integrado por su presidenta, Juez Alfonso de Cumpiano
y los Jueces Broco Oliveras y Miranda De Hostos

## TEXTO COMPLETO DE LA SENTENCIA

En el presente recurso de apelación se nos solicita revoquemos una Sentencia Sumaria Parcial, de carácter final dictada conforme la Regla 43.5 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III R 43.5, por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 21 de febrero de 1995, en un caso sobre incumplimiento de contrato y cobro de dinero.

Sometido el caso para su adjudicación mediante sentencia sumaria por acuerdo de las partes el tribunal de instancia determinó que el Chase Manhattan Bank (Chase) era

responsable solidariamente a Rodríguez & Del Valle, Inc. (R & D) por el monto de la cantidad adeudada por Ashford 1,000, Inc. (Ashford). Inconformes con tal determinación acuden ante nosotros alegando la comisión de cuatro (4) errores.

*"A. Erró el Honorable Tribunal de Primera Instancia al apreciar la prueba documental y determinar que bajo el Anejo A del contrato de construcción el Chase tenía el deber contractual de pagarle el retenido a Rodríguez & Del Valle.*

*B. Erró el Honorable Tribunal de Primera Instancia al apreciar la prueba documental y determinar que Chase recuperó todo el préstamo.*

*C. Erró el Honorable Tribunal de Primera Instancia al determinar mediante el mecanismo de sentencia sumaria que Chase tuvo la intención de perjudicar a Rodríguez & Del Valle.*

*D. Erró el Honorable Tribunal de Primera Instancia al rehusarse dejar sin efecto la sentencia sumaria parcial luego que Rodríguez & Del Valle admitió que existía una controversia real sustancial sobre hechos materiales."*

Analizados los alegatos de las partes y los documentos que se acompañan, confirmamos la sentencia sumaria del tribunal de instancia, por los siguientes fundamentos.

## I

Los hechos que dan lugar al presente recurso se resumen a continuación.

Durante el transcurso del año 1989, Ashford le solicitó al Chase un préstamo de construcción para desarrollar un condominio residencial en el área del Condado. (Ap. 91-141). Se contrató a la compañía R & D para que sirviese de contratista general del proyecto.

Mediante negociaciones entre las partes se establecieron ciertas condiciones bajo las cuales el Chase accedería a otorgar el préstamo solicitado. Ashford somete dichas condiciones al contratista R & D y éste acepta las mismas.

Entre esas condiciones, el Chase se reservó el derecho de aprobar el contrato de construcción que Ashford otorgara con el contratista que eligiera para construir el proyecto, y estableció que el referido contrato debería contener aquellos términos y condiciones que fueran aceptables al Chase.

El 8 de mayo de 1990, Ashford otorgó el contrato de construcción con el contratista R & D. (Ap. 84-90). El Anejo A de dicho contrato establece el procedimiento a seguir para el pago del diez porciento (10%) del retenido a R & D sobre el trabajo completado y aceptado por el Chase. Dicho contrato de construcción y el referido Anejo A, habían sido previamente discutidos por Ashford con el Chase para su aprobación.

En el Anejo A (Ap. 90) se estableció que el retenido del contratista generaría intereses a razón del once porciento (11%) anual, desde una fecha de sesenta (60) días después de alcanzarse un *"substantial completion"* del proyecto, siendo el dueño del proyecto --Ashford-- el responsable por dicha suma. Para el pago del retenido y sus intereses se estableció el siguiente mecanismo; de lo obtenido por la venta de cada apartamento un noventa y tres porciento (93%) se aplicaría al repago del préstamo de construcción a ser otorgado por el Chase; un uno porciento (1%) sería utilizado por Ashford para pagar la comisión del corredor de bienes raíces y un seis porciento (6%) se reservaría por el Banco (Chase) para el pago futuro del retenido al contratista. Este seis porciento (6%) se acumularía en una cuenta de

plica *("escrow")* en el Banco a favor del contratista. El pago del retenido a R & D no sería líquido y exigible hasta que el préstamo de construcción fuera pagado en su totalidad. Una vez se vendiera el apartamento, cuyo noventa y tres porciento (93%) del valor de la venta excedería el balance del préstamo de construcción, la diferencia se acumularía en la cuenta *"escrow"*, hasta que se saldara el monto del retenido adeudado. Pasados diez (10) días desde la venta de ese apartamento, se pagaría al contratista el retenido del dinero depositado en la cuenta *"escrow"*.

Las condiciones del Anejo A, en cuanto al pago del retenido, las requirió R & D, porque el Chase le representaba una entidad más confiable que Ashford. Así surge de la contestación a la demanda del Chase, párrafo 8.

Simultáneamente con la otorgación del contrato de construcción entre Ashford y R & D, se suscribió un contrato denominado *"Contractors Agreement and Consent"*, cuya firma requirió el Chase. Dicho acuerdo fue una condición que impuso el Chase como requisito para otorgar el préstamo de construcción, siendo el Chase quien preredacta el acuerdo. El propósito esencial de ese contrato era que si Ashford abandonaba el proyecto, el Chase tendría la opción de requerir a R & D que continuara como contratista bajo los mismos acuerdos del contrato de construcción que éste tenía con Ashford.

El contrato de préstamo de construcción entre Ashford y el Chase, se otorgó el 15 de mayo de 1992. (Ap. 91-141). En dicho contrato se incorporó por referencia el contrato de construcción con todos sus anejos como uno de los documentos del préstamo *("loan documents")*. El préstamo fue garantizado por los únicos tres (3) accionistas de Ashford y sus respectivos cónyuges.

Luego de finalizado el trámite del préstamo entre el Chase y Ashford se comenzó la construcción del proyecto. El Chase constata la cantidad de trabajo completado que efectúa R & D, mediante un representante que envía al proyecto. El Chase procedía a pagar el noventa porciento (90%) del trabajo completado, así verificado. El restante diez porciento (10%) corresponde al retenido que se le adeuda a R & D.

El procedimiento utilizado por Chase para desembolsar el préstamo de construcción era mediante solicitudes de adelanto de fondos *("loan application")*, que a esos efectos hacía Ashford al Chase. El Chase desembolsaba los fondos y Ashford le emitía un pagaré por cada suma así desembolsada, que se giraba contra la línea de crédito establecida entre las partes mediante el contrato de préstamo de construcción. También se incluía en el pagaré la partida correspondiente a los intereses capitalizados. Es decir, los intereses que devengaba el adelanto de fondos se incluían como principal desembolsado en el *"loan application"* siguiente y así se consideraba como principal el préstamo de ahí en lo adelante.

Siguiendo el procedimiento antes indicado, se emitieron por Ashford un total de cuarenta y tres (43) *"loan applications"* que fueron aprobados por el Chase para un desembolso total bajo el préstamo de construcción de $4,965,772.32 dólares.

El edificio se terminó, en marzo de 1992, siendo entregado, y aceptado por Chase y Ashford. Para mayo de 1992 se vendieron los primeros dos (2) apartamentos. La venta de los apartamentos no se desarrolló según lo esperado y no se vendió ninguna otra unidad hasta febrero de 1994. En el transcurso de este tiempo se venció el término establecido en el contrato para el vencimiento del préstamo.

La fase de venta del proyecto se detuvo, por lo cual Ashford y el Chase otorgaron el 15 de octubre de 1993, un contrato donde establecían una nueva relación jurídica entre las partes. Se establece en dicho contrato que el balance del préstamo de construcción a 30 de

septiembre de 1993, era la suma de $3,469,399.12 dólares de principal e intereses capitalizados.

En el referido contrato, y mediante el pago de $333,000.00 dólares, Ashford y el Chase acuerdan que el edificio pase al control absoluto del Chase, quien podrá venderlo privadamente o ejecutarlo en subasta pública, y todo lo que se obtenga de dicha venta será para el Chase. El préstamo y todas las garantías de pago del mismo, quedan cancelados, siendo la única responsabilidad de Ashford, comparecer a los otorgamientos de las escrituras de compraventa de las unidades que se vendieran en el futuro. El contratista R & D no tuvo participación alguna en dicho acuerdo.

## II

Por entender que los errores *"A"* y *"B"* versan sobre igual controversia procedemos a discutirlos en conjunto. Estos errores se refieren a la apreciación hecha por el tribunal de instancia, sobre la prueba presentada en relación a las determinaciones sobre la responsabilidad del Chase, que emergen del anejo *"A"*, y en cuanto a qué partidas se consideran préstamo, para efectos de computar el saldo de dicha obligación.

El referido anejo *"A"* dispone en lo pertinente que:

*("b) The proceeds of each sale of condominum units shall be distributed as follows: (1) ninety three (93)% to be applied to reduce the Bank Loan for construction financing, (2) one (1)% to be used by the owner for the payment of realtors fees; and (3)* **six (6)% to be reserved by the Bank for the future payment of Contractor's retainages an any interest thereon,** *earned as indicted in part (a), above. This six (6)% shall be deposited in a Contractors Retainage Escrow Account in the Bank furnishing the construction financing..."* (Enfasis suplido).

Surge de lo anterior que la obligación de retener el seis porciento (6)% de las ventas de las unidades, para aplicarse a la deuda del retenido era del Chase. Este incumplió con tal obligación, aplicando la totalidad de los ingresos provenientes de las ventas de unidades a reducir el principal e intereses del préstamo.

Determinó el tribunal de instancia en su Sentencia en la pág. 9, que *"[r]esulta claro que desde que [el Chase] emitió la carta compromiso del 18 diciembre de 1989, se reservó el derecho de aprobar el contrato entre el desarrollador y el contratista, dejando claro que el mismo debía contener aquellas condiciones que le fueren aceptables. Es decir, si no era de su aceptación el contrato de construcción, no concedía el préstamo. Ese control estaba en sus manos."*

El 15 de octubre de 1993, mediante contrato otorgado entre el Chase y Ashford, esta última se liberó de toda responsabilidad sobre el proyecto. Dispone el inciso 4 del referido contrato:

*("a) Borrower and Guarantors jointly and severally release, acquit and forever discharge Lender and Lender's officers, directors, agents and employees (hereinafter collectively "Lender and its Affiliates")* **from any and all claims, demands, debts, actions, causes of action, suits, contracts, agreements, obligations, accounts, defenses, offsets, and liabilities of any kind or character whatsoever,** *known or unknown, suspected or unsuspected, which Borower and Guarantors ever had, now have, or might hereafter have against Lender and its Affiliates, jointly or severally, for or by reason of any matter, cause or thing whatsoever which relates in whole or in part, directly or indirectly with: (i) the Loan Documents; (ii) the Mortgaged Property; (iii) the indebtedness to Lender; or (iv) the uncontested foreclosure, transactions and conveyance contemplated hereunder."*

El Chase asume la posición de deudor ante R & D, sobre aquellas partidas que se le adeudan. Al respecto el artículo 1159 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3243 dispone que:

*"La novación, que consiste en sustituirse un nuevo deudor en lugar del primitivo, puede hacerse sin conocimiento de éste, pero no sin el consentimiento del acreedor."*

En cuanto al monto del principal y los intereses del préstamo el tribunal de instancia concluyó en su Sentencia en la pág. 12, que:

*"[S]egún la información brindada por el propio Chase, el préstamo de construcción se desembolsaba únicamente a base de solicitudes de adelanto que le presentaba Ashford. El documento se conoce como "loan application". Por cada "loan application" aprobado por el Chase, Ashford le emitía un pagaré o "note" que es lo que evidencia el balance de principal e intereses capitalizados del préstamo de construcción, que es lo que Ashford viene obligada a pagar. En este caso el total desembolsado bajo el préstamo de construcción, mediante los 43 "loan applications" aprobados por el Chase, fue de $4,965,772.32 dólares."*

Entendemos que el tribunal no incidió al llegar a tal determinación. Los *"loan applications"* constituyen el reconocimiento de una deuda por parte de Ashford frente al Chase. No puede existir un préstamo cuando no existe un acreedor y un deudor, 31 L.P.R.A. sec. 4511. En cuanto a los gastos incurridos por el Chase para proteger la inversión hecha y poder recuperar el dinero prestado, estos desembolsos no constituyen préstamo ya que no surgen de un *"loan application"* en el cual la otra parte se obligue a devolver el dinero prestado. Concluimos que el monto del principal del préstamo lo constituyen la suma de los cuarenta y tres (43) *"loan applications."*

### III

Los errores señalados como *"C"* y *"D"*, tratan esencialmente sobre la corrección del mecanismo de sentencia sumaria, mediante el cual se dispusieron de las controversias del presente caso. Es necesario señalar que las partes acordaron que la controversia se resolviera mediante ese mecanismo procesal. A continuación se discuten los mismos.

El tribunal de instancia concluyó que *"[l]a cláusula-5.02 que el Chase negocia con Ashford y que elimina ese derecho de reservar el seis porciento 6% para R & D, constituye un contrato en daño de tercero que genera responsabilidad solidaria del Chase y Ashford hacia R & D."*

Al respecto, argumentan los apelantes que incidió el tribunal, al llegar a dicha conclusión ya que uno de los elementos del contrato en daño de tercero es la *"intención de causar daño"*, y que ésta no surge de la prueba presentada por lo que era necesario celebrar una vista, haciendo improcedente la sentencia sumaria dictada en el caso.

Entendemos que no le asiste la razón.

En *Dennis, Metro Invs. v. City Federal Savs.*, 121 D.P.R. 197, 212 (1988), se expusieron los criterios a considerar para determinar si se configura la figura de contrato en daño de tercero. *"[P]ara que exista un contrato en daño de tercero es necesario que se den los requisitos siguientes:*

*"(1) que haya un tercero afectado; (2) que se haya causado un daño a esa tercera persona; (3) que medie un nexo causal entre el daño y el contrato, y (4) que medie la intención de causar daño, ya sea de ambos contratantes o de uno sólo de ellos."*

Veamos los requisitos en detalle.

### (1) Tercero Afectado.

Se requiere que el tercero esté vinculado a una o ambas partes contratantes, y que exista una incompatibilidad entre la relación jurídica de los terceros afectados y la que deriba del contrato celebrado. *Dennis, supra,* pág. 212-213.

En el caso de autos, la relación deudor-acreedor existente entre Ashford y R & D quedó eliminada mediante el contrato de Ashford con el Chase.

### (2) El Daño.

Para que exista un contrato en daño de tercero tiene también que haber un daño causado por dicho contrato al tercero afectado.

Ante nosotros, tenemos un contrato donde se violan derechos subjetivos de crédito de un tercero que está sufriendo las consecuencias del mismo.

### (3) Nexo Causal.

En este caso la producción del daño es producto directo del contrato otorgado por los apelantes.

### (4) Intención de Causar Daño.

Esta intención puede ser de parte de ambos contratantes o de sólo uno de ellos. Ambos contratantes tenían conocimiento de la existencia del contrato entre Ashford y R & D y procedieron a otorgar un contrato donde este último salía perjudicado, de lo cual se puede inferir la intención de causar daño.

En el caso de *Dolphin International of P.R., Inc. v. Ryder Truck Lines, Inc.,* opinión del 31 de enero de 1991, **91 J.T.S. 13**, pág. 8364, se dispuso que *"[g]eneralmente, se le impone responsabilidad aquíliana a aquél que, de forma 'impropia' e intencional, interfiere con los derechos que surgen de las relaciones contractuales del perjudicado con otras personas, si dicha interferencia le ocasiona daños a éste",* más adelante, se expresó que *"[e]n nuestra jurisdicción hemos establecido que, como requisito indispensable para iniciar una acción por interferencia culposa, debe existir un contrato con el que interfiera un tercero."*

Mediante el referido contrato del 15 de octubre, se extinguió la obligación principal original existente entre el Chase y Ashford de pagar el préstamo y de toda responsabilidad en el proyecto incluyendo la de pagar el remanente de los retenidos. Esto a pesar de que R & D no formó parte de dicha transacción.

Sobre este aspecto, dispone el artículo 1161 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3245.

*"Cuando la obligación principal se extinga por efecto de la novación, sólo podrán subsistir las obligaciones accesorias en cuanto aprovechen a terceros que no hubiesen prestado su consentimiento."*

No cabe duda de que en el presente caso R & D no prestó su consentimiento, y de que el Chase interfirió en la relación contractual existente entre éstos y Ashford. Más aún, el Chase reconoció mediante comunicación interna del 25 de mayo de 1993, la existencia de la deuda

entre R & D y Ashford y prosiguió con sus planes de subrogarse en la posición de Ashford. Véase Exhibit, pág. 265. Liberando a ésta, de todas sus obligaciones en el proyecto, e incumpliendo las disposiciones contractuales que había aceptado, principalmente que lo obligaban a retener el seis porciento (6)% del producto de las ventas de los apartamentos para ser depositados en una cuenta plica, con el propósito de saldar la deuda del retenido.

El Tribunal Supremo en *Gen. Office Products v. A.M. Capen's Sons*, 115 D.P.R. 553, 559 (1984) resolvió *"[b]asta a tal efecto que el perjudicado pruebe o presente hechos que permitan inferir que el tercero actuó intencionalmente, con conocimiento de la existencia del contrato."* (Enfasis suplido).

La prueba que permite inferir esa intención es la prueba de que el tercero que se alegue causa el daño, conocía la existencia del contrato previo. *Dennis, supra,* pág. 215.

En el caso de autos, la prueba documental presentada era suficiente para poder inferir la *"intención"* que requiere la jurisprudencia para que se configure el contrato en daño de tercero, por lo que concluimos que el tribunal de instancia no cometió el error indicado.

La Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R.36, faculta al tribunal a que discrecionalmente dicte sentencia sumaria a favor de una parte. El mecanismo de la sentencia sumaria tiene el propósito de aligerar la tramitación de un caso al permitir que se dicte sentencia sin necesidad de que se tenga que celebrar vista en los méritos. Esto es así, cuando de los documentos no controvertidos que se acompañan con la solicitud surge que no existe disputa de hechos a ser dirimida y que sólo resta aplicar el derecho. *Neca Mortgage v. A & W Developers,* opinión del 7 de febrero de 1995. **95 J.T.S. 10,** pág. 603; *Corp. Presiding Bishop CJC of LDS v. Purcell,* 117 D.P.R. 714, 720 (1986).

Como regla general, se dicta sentencia a base de los documentos admisibles en evidencia sometidos por la parte promovida con su moción en oposición y aquellos que obran en el expediente del tribunal. *Medina Morales v. Merck, Sharp & Dohme,* opinión del 7 de abril de 1994, **94 J.T.S. 52.**

De un análisis y evaluación de nuestra parte, de la prueba documental que tuvo ante sí el tribunal de instancia concluimos que no incidió al emitir la sentencia sumaria. *Benjamín Cruz v. Sierra Maya,* opinión de 30 de junio de 1993, **93 J.T.S. 109**, pág. 10922. La prueba documental presentada por las partes sostiene las determinaciones de hechos y conclusiones de derecho que antes discutimos a las cuales llegó el tribunal de instancia y de la misma surge que no existía una controversia real sustancial sobre los hechos materiales del caso.

Por los anteriores fundamentos y en ausencia de los errores señalados se confirma la Sentencia Sumaria Parcial emitida por el tribunal de instancia.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

María de la C. González Cruz
Secretaria General